Norman Evans GREEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 71082.

Court of Criminal Appeals of Texas, En Banc.

June 3, 1992.

Rehearing Denied Sept. 23, 1992.

---

Verna Victoria Langham, New Braunfels, for appellant.

Steven C. Hilbig, Dist. Atty., and Mark Luitjen, Robert McClure and Angela Moore, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for capital murder. See V.T.C.A., Penal Code, § 19.03(a)(2). After finding appellant guilty, the jury answered the special issues in the affirmative and punishment was assessed at death. Article 37.071, V.A.C.C.P. Direct review by this Court is automatic. *Id.*, § (h). Appellant raises thirteen points of error and challenges the sufficiency of the evidence at both stages of trial. We will affirm appellant's conviction.

Viewed in the light most favorable to the verdict, the evidence at trial established the following facts. On February 13, 1985, Wilson Lucas, a retired educator, was visiting a friend who lived at a set of apartments located directly behind a Dyer Electronics in San Antonio. The apartment complex and Dyer Electronics were separated by a single fence in need of repair. Lucas testified that, at about midday of February 13, he came into contact with appellant and his co-defendant in the parking lot of the apartment complex. His suspicions aroused by their behavior, Lucas stated that he carefully looked both men over, as well as the vehicle they were near, during the several minutes he was in contact with them. Lucas said that the two men were still at the apartment complex when Lucas and his friend left. He also testified that about twenty minutes after he left the complex, he heard over the radio that the adjacent Dyer Electronics store had been robbed and the attendant had been shot. Lucas and his friend then went to Dyer's and subsequently gave a statement to police.

Shortly before Lucas had his encounter with appellant, Gerry Rickhoff, the store manager at Dyer Electronics, and his eighteen-year-old employee, Timothy Adams, the victim in this case, were commencing what appeared to be another ordinary work day. Rickhoff recalled in testimony that business had been slow that morning, but that two black men had come into the store in the early afternoon. Rickhoff told the jury that he noticed that the vehicle in which the men had arrived was old and in poor condition.[1] He stated that the victim engaged the men in conversation, then one separated from the discussion and looked over the store. The men then left without asking about any particular equipment and without purchasing anything. Rickhoff identified appellant as one of those two men. The other was later identified as one Harold Bowens.

As Rickhoff prepared to leave for lunch, he noticed the same vehicle returning to the store and later identified the same two men as he had seen in the store previously to be the car's occupants. Rickhoff exited his car, returned to the store, and told Adams not to let the two "steal anything." Rickhoff then left for lunch. Upon arriving at his apartment shortly after leaving the store, Rickhoff received a phone call that there had been a shooting at the store.

Next door to Dyer Electronics was a Midas Muffler Shop with Steve Robinson on duty as manager. Jeff Cochran and Randy Reece were also working there on February 13, 1985. Reece testified that at approximately 1:30 p.m. on that day, he heard sounds that his co-worker Cochran identified as gunshots coming from the direction of the electronics store. Reece stated that he then went to the front door of Midas and saw two black males, later identified as appellant and Bowens, exit Dyer's and get into the same old, beat-up vehicle identified by Lucas and Rickhoff. Reece, Cochran, and Robinson then all ran over to the Dyer building. They found the victim, Adams, alive, but "covered in blood". Reece testified that as he approached the victim, Adams stated several times that he had been shot and needed an ambulance. Reece stated that he found the

---

1. The car was later shown to belong to appellant.

victim slumped over the cash register and then he helped him to the floor. Reece also told the jury that he overheard the victim tell Cochran, "They tried to rob me, but they didn't get anything."

Cochran and Robinson testified to essentially the same facts as did Reece. Cochran stated that he, also, saw the two black men leaving Dyer Electronics in appellant's car. He further recalled that appellant was driving. Cochran told the jury that one of the suspects appeared to conceal something as he fled the store.

The Dyer stores' city manager, Leslie Daniels, testified that he called the store that afternoon only to have his call answered by Adams proclaiming to be dying and asking for help. Daniels had an employee contact the owner, Jerry Dyer. When Daniels arrived at the store, the police and ambulance were both at the scene. Daniels spoke to the victim who told him that two black men who had been in the store earlier that day had done this to him and that Rickhoff knew who they were. Daniels later told the police that nothing appeared to be missing from the store.

Dyer testified that when he arrived at the store, the victim told him that "they" had shot him and he was dying. Dyer explained to the jury that the cash register would open only if a secret button was pushed. He also told the police that no money or inventory appeared to be missing.

The Emergency Medical Services supervisor, Bobbie Bozek, testified that the victim told her that he had been shot by a black man for no reason. She found the victim in critical condition resulting from his sustaining three gunshot wounds. Officer Donald Weilbacher testified that Adams told him that two black men had shot him during their attempt to commit robbery.

Detectives Allen Rabe and Robert Duross of the San Antonio Police Department testified that they were called to the scene

to gather and preserve evidence. Rabe took fingerprints, found a bullet fragment on the floor, and found a bullet hole in the wall from which he retrieved a slug. Duross gave the bullet fragment and the slug to the Medical Examiner's Office. Duross testified that he went over the entire area "with a fine tooth comb," but found no indication that a shot was fired into the floor (as appellant later claimed happened).

After the police arrived at the scene of the shooting and questioned the witnesses, one officer broadcast a description of the suspects and the car involved. Officer James Holguin, of the San Antonio Police Department, testified that he located a car matching the description at an apartment complex.[2] He testified that when he pulled his vehicle close to the suspect vehicle,[3] the two occupants exited the car and began walking in different directions. As the officer recognized the passenger as co-defendant Bowens, he decided to follow the driver, later identified as appellant. Appellant ran when Holguin identified himself as a police officer. Although Holguin gave chase, he momentarily lost sight of the suspect. When the officer saw appellant again, he had removed and discarded the jacket he had been wearing. Appellant managed to elude capture at that time.

Other officers were on the scene by this time and Officer Harold Schott, also of the San Antonio Police Department, testified that he found a gun in the vicinity of where Holguin had chased the suspect. This location was very near the suspect's vehicle. The weapon was identified as a blue steel .38 caliber revolver with a four inch barrel. The six-shot revolver contained four spent shell casings and two live rounds of .38 caliber special Winchester Plus P ammunition. The bullets had been manually altered, with an "X" cut in the nose of each bullet. Schott testified that this type of alteration facilitates a more rapid expansion of the bullet upon impact, resulting in

---

2. Cochran and Reece were subsequently taken to this apartment complex where they positively identified the car as the one that the perpetrators had used in the incident.

3. Holguin was employed at this apartment complex as a part-time security officer. Hence, he was in his personal vehicle patrolling the complex when he came upon the suspect vehicle and was not readily identifiable as a police officer.

faster killing power. Schott explained that the fresh scratches on the gun indicated that it had been dropped on the ground fairly recently. Schott told the jury that he then fingerprinted the gun and was able to obtain prints.

Fingerprint expert Officer Ricardo Contreras testified that he positively identified the prints taken from the gun as those of appellant. None of the prints lifted from the weapon belonged to Harold Bowens. While other ridge prints were found, they were insufficient to make an identification. Contreras testified, however, that the presence of the ridges indicated that the gun had *not* been wiped clean.

Firearms examiner Richard Stengel testified that the .38 caliber gun found by Schott was the weapon used to murder the victim. He testified that the altered Plus P bullets found in the weapon were designed to do more damage and be more lethal than ordinary bullets.

Appellant was subsequently arrested pursuant to a warrant and immediately advised of his constitutional rights. Detective Anton Michalec testified that appellant was then taken to the police station where he was readvised of his rights and questioned. Appellant gave a four-page statement to the detective wherein he basically accused Bowens of planning the entire event and of firing the fatal shot. Appellant explained that when he and Bowens were on their way to pick up some 200 videocassette recorders, Bowens received a .38 caliber gun from a friend which he appeared to place on the floor of the vehicle. Appellant also claimed that Bowens had taken the gun into Dyer's and, when the victim would not cooperate, Bowens fired a shot into the floor of the store.

Dr. Robert Bux performed the autopsy on Adams who had received gunshot wounds to the right elbow, the left anterior chest, and the abdomen below the rib cage. Bux testified that the wound in the victim's arm was consistent with a defensive posture. He also testified that the chest wound traversed downward through the ribs to the lung. The doctor explained that there was no way the six foot one inch tall victim could have received such a chest wound if he were standing straight up and the shooter was six feet tall. The victim had to have been bent over steeply or squatting down in order for the bullet to have taken the trajectory that it did (or the shooter could have been elevated above the victim).

Billy Hazel also testified for the State. He explained that in 1985, he was placed in a cell with appellant while Hazel was under arrest for burglary. Hazel related a conversation he had with appellant in which appellant stated that he had shot a salesperson at Dyer Electronics. Appellant told Hazel that Bowens had been with him and that he (appellant) had made up his mind to rob the place. Hazel also stated unequivocally that he received no deal on his sentence from the State in return for his testimony except to be placed in protective custody. Hazel's attorney also testified in support of Hazel's statement that no deal was made with prosecutors.

Appellant testified on his own behalf at trial. He admitted that he had been convicted twice previously and served time in prison. He admitted going to Dyer's with Bowen; however he maintained that he and Bowens were to "move" two hundred videocassette recorders and that it was an "inside deal." Appellant claimed that Bowens took the gun into the store without his knowledge and that Bowens shot the victim. Appellant also claimed that Bowens shot into the floor. Appellant told the jury that he was at the apartments behind Dyer Electronics, where he and Bowens had been seen by Lucas, earlier that day to visit his brother, but changed his mind. Appellant also made other statements to the jury which were inconsistent with what he had told the police in his earlier statement.

In his tenth point of error, appellant challenges the sufficiency of the evidence to support his conviction. Specifically, he alleges that there is insufficient evidence to prove that the offense of murder occurred while appellant was in the course of committing or attempting to commit robbery. This Court must review *all* of the evidence in the light most favorable to the

verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Dunn v. State*, 721 S.W.2d 325, 327 (Tex. Cr.App.1986). This standard is the same for both direct and circumstantial evidence cases. *Ransom v. State*, 789 S.W.2d 572, 577 (Tex.Cr.App.1989), *cert. denied*, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990).

Appellant contends that the above standard of review must be applied differently in a circumstantial evidence case. He argues that every other reasonable hypothesis except that of the guilt of the defendant must be excluded as dictated by *Wilson v. State*, 654 S.W.2d 465, 467 (Tex.Cr.App. 1983).[4] Specifically, appellant contends that a "robbery" did not occur because the victim never really told anyone that he was robbed and nothing was actually taken. Also, and as he said in his statement to the police, appellant maintains that his intention in going to Dyer's was to "move" some equipment as part of an "inside deal," and that his co-defendant was the one who actually brought the gun and shot the victim. In other words, appellant contends, *he* was not there to *rob* anyone, but rather, just to commit theft. Thus he could not be guilty of robbery. Appellant alleges that the facts as established by the State's evidence are consistent with this hypothesis. This argument is not persuasive.

The indictment in the instant case states in pertinent part that:

on or about the 13TH day of FEBRUARY, A.D., 1985, [appellant], hereinafter called defendant, did then and there intentionally cause the death of an individual, namely: [complainant], by SHOOTING THE SAID COMPLAINANT WITH A GUN, and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of ROBBERY upon [complainant]; [5]

■ This Court has construed the phrase "in the course of committing or attempting to commit" as used in V.T.C.A., Penal Code, § 19.03(a)(2) to mean:

conduct occurring *in an attempt to commit*, during the commission, or in immediate flight after the attempt or commission of the offense, i.e., in this case, of robbery."

*Bower v. State*, 769 S.W.2d 887, 895 (Tex. Cr.App.1989), *cert. denied*, 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989); *Riles v. State*, 595 S.W.2d 858 (Tex.Cr.App. 1980) (emphasis added). Appellant puts great emphasis on the fact that nothing was actually taken from the Dyer store while at the same time admitting that he went to the store to commit theft. This Court stated in *Crank v. State*, 761 S.W.2d 328, at 350 (Tex.Cr.App.1988), *cert. denied*, 493 U.S. 874, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989), that the "actual commission of theft is not a prerequisite to the commission of robbery; the gravamen of robbery is the assaultive conduct and not the theft."

■ In applying the "reasonable alternative hypothesis" construct, "[t]he correct procedure involves accepting the inculpatory circumstances ... and then asking if there is a reasonable hypothesis other than guilt which also would account for such circumstances." *Girard v. State*, 631 S.W.2d 162, at 164 (Tex.Cr.App.1982). Thus, if exculpatory aspects of appellant's statements are fully consistent and in harmony with all of what would otherwise appear to be purely inculpatory circumstantial evidence presented by the State, then under the reasonable alternative hypothesis approach we would be constrained to hold the evidence insufficient. If, on the other hand, exculpatory aspects of appellant's version of events necessarily contradict or

---

4. The "outstanding reasonable hypothesis" analysis has since been abandoned by this Court in *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App. 1991). *Geesa* by its own terms applies prospectively only.

5. The jury charge at the conclusion of the guilt/innocence phase of trial included the offense set out in the indictment as well as a charge on appellant's participation as a party should the jury believe appellant's story that Bowens actually fired the weapon.

conflict with inculpatory inferences drawn from other circumstantial evidence presented by the State, and all of the evidence viewed in the light most favorable to the prosecution would rationally support a jury verdict of guilt to a degree of confidence beyond a reasonable doubt, we must hold the evidence sufficient. In our view this case falls into the latter category.

The evidence established that appellant's fingerprints were on the weapon used in the offense, and that Bowen's were not. Moreover, appellant's former cellmate testified appellant had told him that he, not Bowens, shot the salesperson at Dyer's. These facts are inconsistent with the hypothesis that appellant had no involvement in the assaultive component of the offense. We conclude that there was no other outstanding reasonable hypothesis except for the guilt of appellant. We hold that any rational trier of fact could have found that appellant committed the offense of capital murder beyond a reasonable doubt. Point of error number ten is overruled.

 Appellant complains in points of error one through three that the trial court erred in denying his challenge for cause to venire-person Edwin Kruciak. He complains that Kruciak: 1. "could not accord appellant his constitutional right against self-incrimination," 2. demonstrated a bias "toward the appellant", and 3. "demonstrated bias on punishment phase issue No. 2." When the denial of a challenge for cause is at issue, error is preserved for review if appellant 1) used all of his peremptory strikes, 2) asked for and was refused additional peremptory strikes, and 3) was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause (or granted him additional peremptory strikes so that he might strike the juror). *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex.Cr.App.1986), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). See and compare *Long v. State*, 823 S.W.2d 259, 264 (Tex.Cr. App.1991) and *Harris v. State*, 790 S.W.2d 568, 581 (Tex.Cr.App.1989). The record reflects that appellant used all of his peremp-

tory strikes and asked for and was denied additional strikes. Moreover, Kruciak was the twelfth juror selected. We will assume from the fact appellant challenged Kruciak for cause that he found him objectionable, although he does not expressly state that in the record or in his brief. We find that appellant has preserved these issues for our review.

 Article 35.16, V.A.C.C.P., sets forth the reasons for which the defense may make a challenge for cause. Our concern lies with (a)(9): "[t]hat [the venireperson] has a bias or prejudice in favor of or against the defendant"; and (c)(2):

> [t]hat [the venireperson] has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor.

The determination on appeal is whether the trial court abused its discretion in denying the challenge for cause. See *Mooney v. State*, 817 S.W.2d 693 (Tex.Cr.App.1991). The propriety of the trial court's rulings will be reviewed in light of the venireperson's voir dire as a whole. When faced with a vacillating or equivocal venireperson, this Court will accord great deference to the trial judge who had the better opportunity to see and hear the person. *Mooney*, 817 S.W.2d at 701.

The record reveals that appellant challenged the venireperson for cause at three separate instances in the voir dire process, resulting in the following:

> DEFENSE: I would challenge, Your Honor, at this time. The fact the juror has testified that he would not be able to follow the court's order and not consider any outside information, not seeking outside information, more specifically, newspaper, possible television. And that he would always answer issue number two yes.

> \* \* \* \* \* \*

> Your Honor, at this time, the defense would challenge the juror, Mr. Kruciak, on the fact that there is a possibility, due

to his history, that he would become biased ... for the State against the defense. And also for the answers he made during the general voir dire as to information—outside information that he would seek out and the fact that he would always answer issue number one yes, even though he was talked to—I'm sorry, issue number two. Even though he was talked to by the State and given an extreme hypothetical. Has nothing to do with the hypothetical in this case, wherein he would answer it no.

For those reasons, we would ask that he be excused.

\* \* \* \* \* \*

THE COURT: [In regards to appellant's challenge for cause of the venireperson,] [t]ell me why.

DEFENSE: Under bias, Your Honor. Bias on the answers that he gave in our second session, and I renew our challenge under the same issues that he have in the first session, talking to him.

■ In point of error number one, appellant complains that his challenge for cause should have been granted because the venireperson could not accord appellant his constitutional right against self-incrimination. However, it appears from the above recitation that this complaint did not constitute any part of the basis of appellant's challenge for cause at trial. Because the basis for the challenge raised during voir dire differs from the complaint raised on appeal, appellant has waived error as to this point.[6] *Harris v. State,* 784 S.W.2d 5, 27 (Tex.Cr.App.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990). See *Long, supra.* Point of error number one is overruled.

In point of error number two, appellant contends that Kruciak had a bias (or, as he inconclusively stated in his objection, "there [was] a possibility, ..., that he would become biased") against him and for the State.[7] Appellant makes this contention based on the fact that the venireperson

had previously been the victim of a robbery and appellant was indicted for murder in the course of committing or attempting to commit a robbery. § 19.03(a)(2), supra.

The record reflects that the trial court directed a few general questions and comments to Kruciak and then allowed the State to proceed. The State made a few general comments at the end of which it asked Kruciak the following questions:

[THE STATE]: [Y]ou mentioned [in your questionnaire] that you were the victim of a robbery. Do you understand that has nothing to do with this case?

[KRUCIAK]: I understand.

Q. All right. You are not going to hold that against this Defendant are you?

A. No, not this Defendant.

The State then continued and subsequently finished its questioning without further mention of this subject.

Appellant then proceeded to question Kruciak, but did not make mention of the fact that he had previously been a victim, not even to question him on any potential bias. In fact, it was not until after appellant finished questioning Kruciak, the State questioned him further, and appellant was questioning him a second time that the issue again arose, at which time the following took place:

[DEFENSE COUNSEL]: Okay. Do you know of any reason why you cannot be fair and impartial in this—on this jury that we are here for today?

[KRUCIAK]: None other than my feelings about murder, armed robbery, or things like that.

Q. Okay. What do you mean by that?

A. Well, I mean, you know, as in the questionnaire, I have been a victim.

\* \* \* \* \* \*

So maybe or maybe not. I think it probably has maybe biased me in a certain direction.

---

6. However, in the interest of justice, we have read the venire-person's entire voir dire examination in light of this point and find no abuse of discretion on the part of the trial judge.

7. Although as thus stated appellant's objection was couched only in terms of possible bias, we will address the merits of this point of error.

Q. ...—I believe you were a victim of a robbery?

\* \* \* \* \* \*

A. Yes. Somewhere around early '80s.

Q. The fact that you were a victim of a robbery, would that make you tend to favor the State in this case?

A. Possibly. Yes.

Q. Would it make you tend to disfavor the defense in this case?

A. Oh, yes. I mean, if it's making me favor one.

\* \* \* \* \* \*

Again, human nature, as I'm sitting there trying to be unbiased, I think because of the past incident I might be putting myself in a certain position.

\* \* \* \* \* \*

Q. Okay. Do you have a preconceived notion for or against the State or the defense in this case as you sit there right now?

A. No.

\* \* \* \* \* \*

Q. Do you feel that in your mind you have drawn from, what you have told me, okay, that you have drawn such a conclusion as to the guilt or innocence of the Defendant that would influence you in your action in finding a verdict in this case?

A. No. I haven't drawn any.

Q. Okay. As to this particular Defendant; is that right?

A. In this particular case.

Q. So all that you are telling me, then, is that there is a possibility or probability that because of your experience in the past you may have a bias for the State, and possibly a bias against the ... Defendant; is that right?

A. Right.

\* \* \* \* \* \*

But not necessarily in this situation.

The State then quickly followed up with these questions:

[THE STATE]: You don't like robbers, right?

[KRUCIAK]: Right.

Q. You are not saying that you don't like [appellant] because he's charged with robbery?

A. Right.

Q. Okay. You are not going to say that this at this [sic] point you think he's guilty or anything, or you think the State has a better case just because you were the victim of a robbery?

A. I can't say that. I have no evidence one way or the other.

\* \* \* \* \* \*

Q. [Y]ou don't like robbers. If the jury finds that he's guilty of committing capital murder while in the course of committing a robbery, you are going to have a bias against the person who is guilty of doing something like that, right?

A. Yes.

Q. Human nature?

A. Right.

Q. But you are not going to be unfair to him when you are deciding whether or not he's guilty?

A. Right.

Appellant then made his challenge for cause against Kruciak based on several reasons, but the trial judge requested further questioning regarding his prior status as a victim and illustrated the specific questions he wanted asked. That further questioning established that the veniremember was robbed in the early 1980's when he was delivering pizzas as an extra job. Kruciak unequivocally stated that he would still hold the State to its burden of proof at the guilt/innocence phase, and, if necessary, the punishment phase of trial. Ultimately, he stated that his past experience "could [make me biased], but it wouldn't."

As this Court stated in *Anderson v. State*, 633 S.W.2d 851, at 854 (Tex.Cr. App.1982):

Bias exists as a matter of law when a prospective juror admits that he is biased for or against a defendant, [citations omitted]; admits prejudice against persons who use intoxicating beverages, when the defendant is charged with an offense involving liquor, [citations omitted]; or when he admits or demonstrates

prejudice toward a racial or ethnic class of which the defendant is a member. When a veniremember is shown to be biased *as a matter of law*, he must be excused when challenged, even if he states that he can set his bias aside and provide a fair trial. *Id.* However, it is left to the discretion of the trial court to initially determine whether such a bias exists and the court's decision will be reviewed in light of all of the answers given. *Id.*

■ We cannot say here, in light of all of Kruciak's voir dire testimony, that the trial court erred in concluding he harbored no particular bias against appellant. The trial court did not abuse its discretion in denying appellant's challenge for cause on this ground. Point of error number two is overruled.

In point of error number three, appellant alleges that Kruciak had a bias against the law on which appellant was entitled to rely. Specifically, appellant contends that Kruciak expressed a tendency to always answer the second special issue under Article 37.-071, § (b)(2), supra, regarding the probability of future dangerousness, in the affirmative.

The record reveals that the State began the voir dire with regard to this issue with a general explanation of the second special issue. The State then asked Kruciak whether he could be fair, keep an open mind, and wait to hear all of the evidence before determining the answer to the second special issue. To this, the Kruciak responded, "I think I could do that."

Appellant, however, was a little more detailed in his questioning. Appellant was discussing the terms of "possibility" versus "probability" when the following occurred:

[DEFENSE COUNSEL]: Okay. Now, my question to you is this: You have found this person guilty in the first phase of this imaginary capital murder of intentionally taking a life. Because you have found him guilty of intentionally taking a life, would you always answer that yes, that there is probability [sic] he will commit criminal acts of violence that would constitute a continuing threat to society in the future?

[KRUCIAK: I would lean that way, yes.

\* \* \* \* \* \*

Q. Would you always answer that [second special issue] yes just because you have found a person guilty in the first phase of intentionally taking a life on capital murder?

A. Yes. I would.

Appellant then proceeded to delve into other aspects of the capital sentencing scheme and did not come back to this issue during this phase of questioning.

The State then attempted to rehabilitate Kruciak by giving him an extreme example of a "mercy" killing for insurance proceeds. At this time, the following transpired:

[THE STATE]: There is not a probability this 80-year old man is going to go out and commit another criminal act of violence. Okay?

[KRUCIAK]: In that circumstance, you are probably right.

Q. Exactly. So you wouldn't always answer that question, no. You can wait until you see all the facts before you decide?

A. Okay.

\* \* \* \* \* \*

Q. Okay. Can you keep an open mind and wait, in this case or any other case, if you are a juror in a capital murder in the punishment phase, and decide that issue based upon the evidence?

A. Yes.

When appellant was again given the opportunity to question him, Kruciak answered unequivocally that he would *not* always answer the second punishment question "yes" on the basis of a guilty verdict alone, and that it was up to the State to prove up the second the issue to him.

■ When confronted with a venireman who vacillates on the question of his ability to answer special issues under Article 37.071, § (b)(2), supra, without conscious bias or distortion, this Court defers to the findings of the trial court. *Perillo v. State*, 758 S.W.2d 567, at 576–77 (Tex.Cr. App.1988). Kruciak was just such a vacil-

lating venireman. First he maintained a guilty verdict at the guilt phase of trial would dictate a 'yes' answer to the second special issue. Later he acknowledged, during the State's attempt to rehabilitate, that he would have to consider the second special issue in light of all the evidence, including that adduced at the punishment phase, and that not every guilty verdict would dictate an affirmative answer to the second special issue. Such a record "presents an adequate basis to support the trial court's ruling *either* that the venireman was challengeable for cause ... *or that [he] was not." Id.* at 577 (emphasis in the original). Thus, we cannot say the trial court abused its discretion in failing to grant appellant's challenge for cause. Consequently, we overrule point of error number three.

■ In point of error number four, appellant complains that the trial court erred in overruling appellant's Motion for New Trial "in view of direct evidence of outside interference with the jury." The record reveals that sometime during the evening before jury deliberations were to begin on punishment, the jury foreperson, Estella Hamilton, was visited at her home by an unidentified woman who asked her not to show up in court the following day. The unidentified woman offered the foreperson one thousand dollars in cash for her compliance.

Article 36.22, V.A.C.C.P., states that:
No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

When a juror does converse with an unauthorized person, injury to the accused is presumed. *Mayo v. State,* 708 S.W.2d 854, 856 (Tex.Cr.App.1986). However, this presumption is rebuttable. *Id.* If it is shown that the case was not discussed or that nothing prejudicial to the accused was said, then appellant has not been injured. If this is the case, then the verdict will be upheld and a new trial is not required. *Thomas v. State,* 699 S.W.2d 845, 853 (Tex.Cr.App. 1985).

■ In the present case, the unauthorized contact and bribe was immediately reported to the court and an evidentiary hearing was held on the matter. Testimony at the hearing revealed that no bribe was accepted, that the juror did not comply with the woman's request to not show up, and that the juror discussed the incident with no one other than the court and the parties to the case. Furthermore, all twelve jurors, including the juror contacted, signed affidavits stating that they arrived at their individual verdicts solely from the evidence presented during the trial of the case and the law given to them by the court. The affidavits also stated that the jury did not discuss the subject of an attempt to bribe a juror or prevent a juror from performing his or her duty in accordance with the law; nor was such a subject discussed in their presence. On these facts, the trial court was justified in concluding appellant suffered no prejudice. Because the trial court committed no error, we overrule appellant's fourth point of error.

Appellant alleges in point of error number five that the trial court erred by denying his Motion for a Life Sentence after the jury notified the trial court that it could not reach a verdict. The record reveals that the jury began deliberations at 10:45 a.m. on January 30th and sent a note to the judge at approximately 5:30 p.m. informing him that they could not unanimously agree on any of the issues. The judge told the jury to continue their deliberations. This action drew an objection from appellant coupled with the Motion for a Life Sentence which is the subject of appellant's complaint on appeal. The objection and motion were overruled by the trial judge. At 6:10 p.m., the jury was recessed for a dinner break and subsequently reconvened for deliberations, the latter of which lasted until 12:15 a.m. when the jury was sequestered for the evening. The jury again reconvened at 8:30 in the morning and informed the judge approximately one hour later that they had a verdict.

■ Although the jury seems to have deliberated for approximately thirteen

and one-half hours total, appellant complains of the events that occurred after less than one-half of that time. There is no set time limit on the amount of time a jury may deliberate. Article 36.31, V.A.C.C.P., states that:

> After the cause is submitted to the jury, it may be discharged when it cannot agree and both parties consent to its discharge; or the court may in its discretion discharge it where it has been kept together for such time as to render it altogether improbable that it can agree.

Under this provision we have held that the length of time the jury may be held for deliberation rests in the sound discretion of the trial judge, who will not be reversed on appeal absent a showing by appellant that that discretion was abused. *Montoya v. State*, 810 S.W.2d 160, 166 (Tex.Cr.App. 1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991). This Court has considered very similar situations in the past and found no abuse of discretion on the part of the trial judge. See *Montoya, supra*, and cases cited therein.

██ As pertains to the length of time a jury may be held in deliberations, we observe that in *Burnett v. State*, 754 S.W.2d 437, 447–8 (Tex.App.—San Antonio 1988, pet. ref'd), the jury sent a note to the court indicating it was deadlocked approximately *eleven* hours after it had begun deliberating and the trial court instructed the jury to continue its deliberations. The jury sent a second note to the trial court over eight hours later still maintaining its deadlocked position and asking for instructions. The jury was recessed for the evening. When they resumed deliberations in the morning, indicating that the deadlocked position was not likely to change, the appellant again moved for a mistrial as he had done when the first note was handed in to the court. The judge again overruled his motion and approximately 11:30 that morning, the jury returned a verdict.

Turning to this case, we must first consider that it involves a prosecution for capital murder. We must also consider that, on punishment, the jury had approximately five days full of evidence to review and reflect upon involving the testimony of about twenty-six witnesses.[8] In light of these circumstances, we find no abuse of discretion in the court's order for the jury to continue deliberations after only six and one-half hours. In fact, given the nature of the potential sentence involved in this case, it is unlikely that there would have been such an abuse even after thirteen hours. Point of error number five is overruled.

██ In point of error number six, appellant argues that the trial court erred when it accepted the co-defendant's assertion of a Fifth Amendment claim.[9] The record reveals that the defense called the co-defendant, Harold Bowens, to the stand and the following transpired:

> THE COURT: Mr. Bowens, let me explain. First of all, the defense has called you as a witness. I simply want to ask you, do you want to testify, or do you not want to testify?
>
> * * * * * *
>
> THE WITNESS: No.

Whereupon, appellant's attorney asked to approach the bench and the record reveals only that "there was an off-the-record discussion at the bench." No further action or inquiry was taken by either party pertaining to proffered testimony from Bowens.[10] Absent an offer of proof, nothing is preserved for our review. Tex.R.Cr.Evid., Rule 103(a)(2). Point of error number six is overruled.

██ In his seventh point of error, appellant complains that the trial court abused its discretion in refusing trial counsel's motion to withdraw. In the instant case, the record reveals that appellant was incarcer-

---

8. This includes four days of testimony from the guilt/innocence phase of trial and one more day of testimony from the punishment phase.

9. Appellant and co-defendant were not tried in the same trial.

10. The record does not reveal any attempt to make an offer of proof as to what Bowens' testimony might have been, nor does it reveal how any such testimony would have helped or hurt appellant.

ated in Bexar County where his trial was subsequently set for and held in early January, 1990. He was initially represented by appointed counsel. In the latter part of May or early part of June, 1989, appellant retained new counsel, John Causey. Causey sought and engaged co-counsel, Demetrio Duarte. In early October of the same year, Causey accepted a position in Montgomery County, approximately 250 miles from Bexar County. He then filed a motion to withdraw from the case in the latter part of October, 1989, because, he contended, his retention "would seriously hinder [appellant's] right to effective consultation and right to effective counsel." Duarte also sought to withdraw because appellant did not wish "to retain [him] as his counsel to proceed further."

After testimony by Causey and Duarte in the hearing on counsel's motion to withdraw, the trial court pointed out that, prior to or concurrent with appellant's hiring of Causey and Duarte, the court had appointed two other attorneys to represent appellant and had a trial date set for September, 1989. However, when Causey notified the court of his employment, the trial court released appointed counsel and reset the trial date to January, 1990, to accommodate Causey and Duarte. By the time of the hearing on the motion in late October, 1989, the trial court had already set trial procedures in motion including having the clerk's office prepare to call one hundred venirepeople.[11] The State suggested appellant be given one week to retain new counsel. However, the trial court refused this suggestion and denied counsel's request to withdraw. The trial court based its action on the above-stated concerns as well as on the fact that retained counsel had already been paid a partial fee.

■ It is generally within the discretion of the trial court to determine whether or not trial counsel should be allowed to with-

draw from a case. *Brewer v. State*, 649 S.W.2d 628, 631 (Tex.Cr.App.1983). However, the right to counsel may not be manipulated so as to obstruct the judicial process or interfere with the administration of justice.[12] *Wallace v. State*, 618 S.W.2d 67, 70 (Tex.Cr.App.1981). In the instant case, the Motion to Withdraw was brought forth in late October. Jury selection was set to begin in early to mid-December, just over one month away. Furthermore, the trial had already been reset once to accommodate Causey.

Causey told the trial court in the hearing on his motion that contact with appellant was very difficult except on a personal basis and there could be "no real appointments made where he could come in or telephone calls made." The hearing was held, however, before Causey moved 250 miles away, and seemingly before he ever tried an alternative approach to contacting appellant. Causey's opinion as to how difficult it would be to contact appellant to prepare for trial was therefore speculative at best. Furthermore, there was no testimony as to whether trial counsel had to move away immediately in order to keep his new job or whether there was some flexibility in finishing prior commitments like the one before him here. There was no testimony Causey would be distracted or unable to do an adequate job at trial, nor any indication from the trial record that he did not give representation of appellant his undivided attention. Counsel on appeal now argues that appellant was denied effective assistance of counsel, but shows us no place in the record where this is documented.

Given the circumstances and the testimony adduced at the hearing on the Motion to Withdraw, we cannot say that the trial court abused its discretion in denying the

---

**11.** The record is unclear as to whether these one hundred venire-people had already been notified by the clerk to show up at a certain place and time, thereby inconveniencing well over one hundred people and costing the taxpayers several hundred dollars, or whether the clerk's office had merely obtained the requisite number

of names from the computer, thereby only inconveniencing their office and resulting in several hours of potentially wasted work.

**12.** Nor may appellant's right to select counsel of his choosing be so manipulated. *Thompson v. State*, 447 S.W.2d 920, 921 (Tex.Cr.App.1969).

motion. Point of error number seven is overruled.

■ Appellant's points of error numbers eight and eleven challenge the sufficiency of the evidence to sustain the jury's affirmative answers to the first and second special issues. Article 37.071, §§ (b)(1) and (2), supra.[13] The well-established standard in reviewing these two points of error is, looking at the evidence in the light most favorable to the jury's verdict, whether any rational trier of fact could have found the elements of Article 37.071(b), V.A.C.C.P., beyond a reasonable doubt. *Earhart v. State*, 823 S.W.2d 607, 619 (Tex.Cr.App. 1991); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App.1987) (respectively).

In point of error number eight, appellant contends that the evidence is insufficient to support the affirmative finding of "deliberateness" in the punishment phase of the trial. See Article 37.071, § (b)(1). Again, to determine the sufficiency of this evidence, we must view the evidence presented in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found, beyond a reasonable doubt, that the appellant acted "deliberately" or with reasonable expectation or contemplation that death would result. *Meanes v. State*, 668 S.W.2d 366, 370 (Tex.Cr.App.1983), *cert. denied*, 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 476 (1984).

■ Appellant argues that the jury could not find affirmatively on the issue of deliberateness because the appellant did not fire the fatal shot. In fact, appellant contends, as he testified at trial, his co-defendant took the weapon into the store without his knowledge and killed the victim. While the law of parties has long been held to apply to capital cases, it does not so apply in the punishment phase. *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). Therefore, the jury is required to make their determination based solely on the behavior and perceived intent of appellant and *not* the actions or intent of his co-defendant.[14] In this case, the jury was properly instructed to consider the special issues in light of the appellant's mental state and conduct rather than the mental state or conduct of any other person or persons.

■ The short answer to appellant's contention is that, as pointed out in our treatment of his tenth point of error, challenging sufficiency of the evidence to establish his guilt, there is evidence from which the jury could rationally conclude appellant was the triggerman in this cause. Whether the jury could have found his conduct as a party to have been "deliberate" is a question we therefore need not address. Appellant's point of error number eight is overruled.

■ Appellant maintains in his point of error number eleven that the evidence was insufficient to sustain the jury's affirmative answer to the second special issue on future dangerousness. Article 37.071, § (b)(2), supra. This Court has set out a number of factors that may be considered in making this determination. E.g., *Keeton v. State*, supra, at 61.

The evidence of the crime itself indicated that the underlying robbery was planned, complete with casing the store before the incident and waiting until only one clerk remained. Furthermore, the evidence was such that the jury could have inferred that appellant, and not his co-defendant, antici-

---

**13.** The charge on punishment, in pertinent part, stated as follows:

SPECIAL ISSUE I

Was the conduct of the defendant that caused the death committed deliberately and with the reasonable expectation that the death of Timothy Adams would result?

SPECIAL ISSUE II

Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

**14.** We have observed that "as to an accused who is convicted as a party to capital murder, what must be scrutinized for 'deliberateness' is not the conduct of the primary actor which caused the death, but the conduct of the party by which he solicited, aided, encouraged or directed that killing." *Martinez v. State*, 763 S.W.2d 413, at 420, n. 5 (Tex.Cr.App.1988). See also *Webb v. State*, 760 S.W.2d 263, at 267 (Tex.Cr.App.1988).

pated the need for and procured the weapon used in the offense. Additionally, the jury could have inferred an intent to use that gun in a deadly manner since it was loaded with ammunition that had been physically and purposely altered to give it more killing power. The evidence also revealed that appellant did have prior experience with firearms. His own testimony plus supporting State's exhibits revealed that appellant had two prior convictions for unauthorized use of a vehicle and one prior conviction for burglary of a habitation. Appellant also recounted one incident in which he was found to be carrying a concealed weapon.

The record also reveals that several persons testified at the punishment stage that appellant's reputation in the community for being a peaceable and law abiding person was bad. An assistant warden testified that appellant had been segregated six times while in prison because of various difficulties. Additional witnesses testified to various unadjudicated offenses involving appellant, including some that were committed when appellant was a juvenile.

Given this evidence, we believe it would be rational for a trier of fact to believe that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. Point of error number eleven is overruled.

In point of error number twelve, appellant complains that the trial court erred in admitting a photograph of the deceased into evidence over appellant's objection. Specifically, he complains of a photograph depicting the victim as he appeared after death.[15] Appellant alleges that the photograph was introduced purely for inflammatory purposes and, as such, constituted error. However, the State counters that, notwithstanding an attempted stipulation by

appellant, the photograph was introduced to prove identity of the victim.[16]

■ Admissibility of such evidence is governed by Tex.R.Cr.Evid., Rule 403, which states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

See *Long v. State,* 823 S.W.2d 259, 271–272, fn. 18 (Tex.Cr.App.1991). Rule 403 favors the admission of relevant evidence[17] and carries a presumption that relevant evidence will be more probative than prejudicial. *Montgomery v. State,* 810 S.W.2d 372, 389 (Tex.Cr.App.1990). See *Long,* 823 S.W.2d at 271.

■ A court may consider several factors in determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice. These factors include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Long,* supra. The availability of other means of proof and the circumstances unique to each individual case must also be considered. *Id.*

■ The single photograph of which appellant complains in this point of error is a color photograph approximately three and one-half by four inches in size. It shows a close-up shot of the victim's head and the top part of his shoulders with various tubes and other medical equipment still in place from the doctors' attempts at saving the victim. While some blood is visible in the photograph, it is only seen with fairly close inspection. Finally, while we know from

**15.** To be more precise, the photograph was a post-surgery, but pre-autopsy photograph.

**16.** See *Jones v. State,* 1992 WL 84123 (Tex.Cr. App. No. 69,894, delivered April 29, 1992), slip op. at 20–22 (appellant was willing to stipulate to the identity of the deceased as well as the manner of death).

**17.** The parties do not argue that the photograph is not relevant. The identity of the victim and the manner and means of death surely are facts that are of consequence to the determination of the action. See *Long,* 823 S.W.2d at 271–272, n. 18.

the record that the victim was bloated as a result of the gunshot wounds, we also note that, at first glance, the subject of the photograph looks no different than a sleeping or unconscious overweight man under intensive medical care. These circumstances support the trial court's finding that the prejudicial effect of this photo, if any, did not substantially outweigh the probative value. Hence, we hold that no error was made by the trial court in admitting this exhibit. Point of error number twelve is overruled.

Appellant alleges in points of error nine and thirteen that the trial court erred in overruling appellant's objection to hearsay testimony. Specifically, appellant complains in point of error number nine of the statements of the victim which were admitted through various witnesses and he complains in point of error number thirteen of some statements he had made to an ex-cellmate which were admitted through that witness.

 In point of error number nine, appellant correctly acknowledges that "dying declarations" under Tex.R.Cr.Evid., Rule 804(b)(2) are exceptions to the general prohibition against hearsay evidence and, therefore, are admissible at trial.[18] Under the express language of the above rule, the declarant's statements must be made at a time when *the declarant* believes that his death is imminent. See *Rushing v. State*, 813 S.W.2d 646, 650 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd); *Johnson v. State*, 770 S.W.2d 72, 76 (Tex.App.—Texarkana 1989), *aff'd*, 815 S.W.2d 707 (Tex.Cr. App.1991); *Hayes v. State*, 740 S.W.2d 887, 888–9 (Tex.App.—Dallas 1987). Here the victim expressly stated to witnesses, "I'm dying." The trial court could readily have accepted that the victim, the declarant of the statements, did, in fact, believe that death was imminent. Tex.R.Cr.Evid., Rule 104(a).

Appellant contends that the emergency medical technician on the scene made statements to the victim that were designed to alleviate his fear of dying and, therefore, the victim's statements should not be considered an exception. This argument fails for two reasons. First, the medical technician was not even on the scene when the first several statements of which appellant complains were made. Thus, she could not have alleviated his fear (or changed his belief). Secondly, Rule 804(b)(2) speaks of the declarant's belief, not someone else's, and there is no indication in the record that the medical technician's statements actually did relieve the victim's fear and belief that he was dying. The trial court was justified in finding that the victim's statements fell within the "dying declaration" exception to the hearsay rule and did not err in admitting them into evidence. Point of error number nine is overruled.

 In point of error number thirteen, appellant complains of the admission of statements he made to his ex-cellmate, Hazel. He relies on Tex.R.Cr.Evid., Rule 803(24), the "statement against interest" exception to the hearsay rule, to support his argument.[19] He contends that the key to the admissibility of the statements is their "trustworthiness," since the rule specifically requires corroborating circumstances indicating trustworthiness in order for such a statements to be admissible as against interest. See *Flix v. State*, 782 S.W.2d 1, 3 (Tex.App.—Houston [14th

---

**18.** Under Rule 804(b)(2), "[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death" is admissible notwithstanding the general objectionableness of hearsay under Tex.R.Cr. Evid., Rule 802.

**19.** Tex.R.Cr.Evid., Rule 803(24) excludes from the general rule that hearsay is inadmissible the following:

**Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

**412**

Dist.] 1989, pet. ref'd). Appellant also makes a blanket assertion that such corroborating circumstances do not exist. We do not agree.

As previously set out in the facts recited for the sufficiency of evidence points of error, corroborating circumstances did exist including (among other details) the fact that appellant was identified by a number of people as being at the scene at the time of the murder and that only appellant's fingerprints were on the murder weapon. It was within the trial court's discretion to find the statements were sufficiently corroborated to be trustworthy, and we hold it was not error to have admitted them into evidence. Point of error number thirteen is overruled.

Finding no reversible error, we affirm the judgment of the trial court.