TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-01-00013-CR


 NO. 03-01-00014-CR






Torrance Ray Evans, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT,


NOS. B-99-0269-S & B-99-0270-S, HONORABLE BARBARA WALTHER, JUDGE PRESIDING





 

 A jury convicted Torrance Ray Evans of two counts of theft. Evans was convicted
of depriving Lynn Alexander, a car dealer, of money on several occasions. Evans managed a body
shop owned by a company Alexander wholly owned. The State's theory was that Evans, through
companies he controlled (Baxter Auto Parts and Auto Trim Out), billed and took payment from
Alexander's company for parts not delivered. The court assessed as punishment terms of fifteen and
thirty years in prison. Evans raises four issues on appeal, complaining of the court's admission of
evidence and of the insufficiency of the evidence to support the conviction. We will affirm the
judgments.

 Though there are two trial and appellate cause numbers, we will consider the cases
together. The causes arise from a continuous sequence of events. In appellate cause No. 03-0100013-CR, the jury found Evans guilty of taking between $1500 and $20,000 on several instances
from September 1996 to September 1997, taking between $20,000 and $100,000 in all. In appellate
cause No. 03-01-00014-CR, the jury found him guilty of taking between $1500 and $20,000 on
several instances from November 1997 to March 1998, taking between $100,000 and $200,000 in
all. The charges in the two indictments were tried in a single trial with no discernable differentiation. 
There is one reporter's record. The issues on appeal are identical and the briefs, but for the different
cause numbers and punishments detailed, are identical.

 Evans first contends that the court erred by admitting bank records obtained through
a grand jury subpoena. He contends that the admission of these records violated his expectation of
privacy in these records, violating the federal and state constitutions. See U.S. Const. Amend. IV;
Tex. Const. art. I, § 9. He also complains about the State's use of the grand jury subpoena to develop
a prosecution instead of simply to deliver evidence to the grand jury.

 The Supreme Court has rejected almost identical concerns. See United States v.
Miller, 425 U.S. 435 (1976). In Miller, the district court denied a defendant's motion to suppress
records obtained from a bank pertaining to the defendant's accounts at that bank by use of a grand
jury subpoena. Id. at 438-39. The court of appeals reversed, holding that the subpoena of the
records from the bank improperly circumvented the defendant's Fourth Amendment protection
against unreasonable searches and seizures. Id. at 439. The Supreme Court reversed the appellate
court's judgment, holding that the defendant had no privacy right that covered the bank's records,
reasoning that such documents as checks, deposit slips, and financial statements are conveyed to the
bank voluntarily and are viewed by parties to the transaction as well as bank employees, defeating
any claim of privacy interest. Id. at 442. The Court wrote that


 the Fourth Amendment does not prohibit the obtaining of information revealed to a
third party and conveyed by him to Government authorities, even if the information
is revealed on the assumption that it will be used only for a limited purpose and the
confidence placed in the third party will not be betrayed.


Id. at 442-43. 

 The court of criminal appeals has rejected a similar challenge to the admission of a
hospital's records of a defendant's blood-alcohol test obtained by grand-jury subpoena. State v.
Hardy, 963 S.W.2d 516, 518 (Tex. Crim. App. 1997). The court wrote, "[W]hatever interests
society may have in safeguarding the privacy of medical records, they are not sufficiently strong to
require protection of blood-alcohol test results from tests taken by hospital personnel solely for
medical purposes after a traffic accident." Id. at 527. Though both cases were decided under the
federal constitution only, we see no basis on which to conclude that the state constitution would
provide more protection on these facts. We resolve issue one in favor of the judgments.

 Evans next contends that the district court erred by admitting evidence of his
character to show action in conformity with that character. See Tex. R. Evid. 404(a). An appellate
court reviews the trial court's decision to admit or exclude evidence under an abuse of discretion
standard. See Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); Montgomery v. State,
810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990). A reviewing court should not reverse a trial court
whose ruling falls within the "zone of reasonable disagreement." Id. at 391. Evidence of other acts
is not admissible to show character conformity, but may be admissible for other purposes such as
to show motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake
or accident. Tex. R. Evid. 404(b). Evans alleges that the State introduced statements he made in his
personnel records to show that he lied, hoping the jury would infer that he was more likely to have
committed theft. (1) The State contends that it introduced the evidence, not to prove character
conformity, but to link Evans to phony parts purchases made from Auto Trim Out by linking him
to Rachella Leggett. Testimony showed that Evans introduced Rachella as his wife. Documentary
evidence introduced showed that on some personnel documents, Evans claimed Rachella as his wife. 
Concerns about Evans's credibility arise from the State's introduction of other evidence in which
he claimed Tina Evans as his wife, and still others claiming Tina as his sister or his daughter. 
Rachella's driver's license listed the same address as Evans's former address in Mesquite, Texas. 
Rachella signed a document saying she did business as Auto Trim Out and endorsed many checks
made to that company. Though the varying representations in the personnel documents indicate
some deceit, they are admissible to link Evans to Auto Trim through Rachella. The district court did
not abuse its discretion in admitting this evidence. 

 The court also admitted over objection evidence showing that on one insurance form
Evans listed Tina Evans as his sister. Even if the court erred by admitting this evidence, the error
is harmless. Other evidence, admitted without objection, showed that Evans variously claimed Tina
Evans as his wife and as his daughter. Admission of one representation that he claimed Tina as his
sister can have little effect on his credibility in light of other evidence admitted without objection
that shows he has claimed both Tina and Rachella as his wife, has claimed both as his dependents
along with his children, and has also claimed Tina as his daughter. If admission of this evidence was
error, we hold that it did not affect his substantial rights. See Tex. R. App. P. 44.2(b). We resolve
issue two in favor of the judgments.

 By his third and fourth issues, Evans contends that the verdicts were not supported
by legally and factually sufficient evidence. When reviewing the legal sufficiency of the evidence,
we look at all the evidence in the light most favorable to the prosecution and ask whether any
rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
See Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Staley v. State, 887 S.W.2d 885, 888 (Tex.
Crim. App. 1994). Any inconsistencies in the evidence should be resolved in favor of the verdict. 
See Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App . 1988). This standard of review is the
same for both direct and circumstantial evidence. See Green v. State, 840 S.W.2d 394, 401 (Tex.
Crim. App. 1992). When reviewing the factual sufficiency of the evidence, we consider all the
evidence in a neutral light and reverse only if the verdict is so contrary to the overwhelming weight
of the evidence as to be unjust. See Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Clewis
v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We must accord the jury's verdict due
deference and should not, in effect, become the thirteenth juror. See id. at 133. We cannot interfere
with the jury's resolution of conflicts in the evidence or pass on the weight of testimony or credibility
of a witness; unless the record clearly reveals that a different result was appropriate, we defer to the
jury's determination concerning what weight to give contradictory testimonial evidence because the
jurors' resolution of such conflicts often turns on an evaluation of credibility and demeanor by the
jury. See Johnson, 23 S.W.3d at 8.

 Evans was charged with theft. Tex. Penal Code Ann. § 31.03 (West Supp. 2001). 
A person commits theft if he unlawfully appropriates property with the intent to deprive the owner
of property. Id. "Appropriate" means to acquire or otherwise exercise control over property. Id.
§ 31.01(4)(B). Appropriation is unlawful if it is without the owner's effective consent. Id.
§ 31.03(b)(1). Consent is not effective if it is induced by deception or coercion. Id. § 31.01(3)(A).

 The State called many witnesses and introduced hundreds of documents in support
of the charges. About two years after Evans became body-shop manager, Alexander's staff (2) grew
concerned about the high numbers of accounts receivable in the body shop. There was a significant
discrepancy between the number of cars listed in the records as "work in process" and the number
of cars actually in the shop. All of the suspicious accounts involved purchases of parts from Baxter
Auto Parts and Auto Trim Out.

 Further investigation showed many abnormalities in invoices and repair orders
involving parts from Baxter and Auto Trim. More than $250,000 in insurance claims for parts
purchased from these companies remained unpaid. On cars with these unpaid claims, there were
often two repair orders or two invoices for the same car. The first document would show parts
purchased and paid for by insurance; the second would show the parts from the first documents plus
many more parts purchased from Baxter or Auto Trim, but not paid for by the insurance company. 
Often, these extra parts were duplicative of parts on the first documents; sometimes, the duplicative
parts were listed by different names referring to the same part, while other times the second
documents would show the ordering of a multi-part assembly and, separately, the components of that
assembly. Some repair orders listed many parts but would not account for the labor needed to install
them. Evona Artzel, the body-shop office worker, testified that many of these extra parts appeared
unnecessary given the original description of the damages--for example, replacement of front-end
parts to repair a rear-end collision, or parts supplied to repair totaled cars. (3) More than sixty times,
the second documents included the purchase of a clip--a portion (often the front third or back third)
severed from a "donor car" and installed onto a customer's car; this struck Artzel as unusual because
she did not remember seeing more than five such clips delivered during the eighteen or so months
she worked for Evans; Artzel said that, because clips were massive, their arrival and unloading
created quite a stir in the shop and required the assistance of many shop employees. Artzel also
testified that Evans told her that she was to bill for parts that were not delivered or installed as a
means of eliminating a shortfall in the parts inventory of a car dealership purchased by Alexander;
she said that d'Atri dismissed her concerns about this procedure. Artzel said she was surprised to
learn later that Alexander had paid Baxter and Auto Trim for these nonexistent parts. She also said
that Evans was the only person in the body shop who had the authority to request checks be written. 

 Alexander's staff also testified that there were no freight documents pertaining to
parts from Baxter and Auto Trim. They testified the freight documents in their records accounted
for all parts in their invoices except for the parts supposedly supplied by Baxter and Auto Trim. 
They said that, though they would not necessarily have freight documents for parts purchased locally,
the addresses they had for Baxter and Auto Trim were in Dallas and Waco, respectively. There was
testimony that, nevertheless, at least one check to Baxter was deposited the day it was written, which
was difficult to square with Alexander's location in San Angelo and Baxter's Dallas address. 
Contrary to the addresses for Baxter and Auto Trim given to Alexander's company, however,
assumed-name certificates filed in Tom Green County as well as signature cards for the Baxter and
Auto Trim's bank accounts in San Angelo banks showed the addresses of the two companies were
the same as Evans's San Angelo residence.

 Alexander's staff said that, when they originally expressed concern to Evans about
the growing levels of accounts receivable, Evans produced a representative from an insurance
company (first by phone and then in person) who blamed the slowdowns in payments on
restructuring in the insurance company's claims handling organization, new computers, new
employees, and general bureaucratic inefficiencies. When continued problems prompted further
inquiry independent of Evans, other Alexander employees were unable to locate this representative
(though they could not say certainly that he did not work for the insurance company).

 Evans tried to undercut the State's evidence through cross-examination and other
witnesses. Alexander employees admitted that sometimes cars carried as "work in process" were
not in the shop because they were awaiting towing or otherwise in the customers' possession. Artzel,
who assessed Alexander's records to explain many of the discrepancies, admitted that she had no
formal training as a mechanic or appraiser. Alexander employees conceded that discrepancies
between estimates, original repair orders, and invoices can occur absent fraud because some
problems with damaged cars only become apparent after work begins. A former body-shop
employee explained that sometimes cars that were considered totaled--based on estimates involving
new parts--would nevertheless be repaired with used parts; he estimated that the Alexander body
shop used an average of two clips per month, and as many as five clips some months. 

 On appeal, Evans also emphasizes the absence of certain evidence. He points to the
lack of definitive proof that parts ordered from Baxter and Auto Trim were not installed and that the
customers' insurance companies never reimbursed Alexander for the payments to Baxter and Auto
Trim. He argues that there was no showing that the alleged thefts rendered the body shop
unprofitable, as he argues theft on such a scale should have done.

 We conclude that the evidence is legally and factually sufficient to support the
convictions. Even with the contrary evidence, the jury could have chosen to rely on evidence that
Evans directed that Alexander's money be sent to Baxter and Auto Trim, companies that he
controlled, for parts that Alexander never received. Whether customers' insurance companies paid
duplicative claims for nonexistent parts has no bearing on the theft charge; (4) the question is whether
Evans deprived Alexander of money in exchange for parts he never intended to deliver. From the
evidence, the jury could have concluded that Evans acquired the funds sent to Baxter and Auto Trim,
through himself and Rachella Evans, whatever her connection to him. Though Alexander gave
Evans authority to purchase parts, the jury could conclude that Alexander never consented to receive
no parts for his money. The total claimed losses of more than $250,000 satisfies the amounts alleged
to have been stolen; the aggregate of the lower ends of the ranges charged is $120,000 and the upper-end aggregate is $300,000. (5)

 Evans's argument regarding the absence of evidence of unprofitability of the body
shop does not withstand scrutiny. Huge losses from theft can coexist with immense profitability. 
More critically, however, the enterprise's profitability is irrelevant; the law does not distinguish
between theft from successful and theft from unsuccessful enterprises. Further, the theft would not
have affected the shop's profitability because the amounts stolen were carried as accounts receivable. 
The absence of a deficit is also explainable from an accounting perspective; after the theft came to
light, Alexander collected on an insurance policy that covered most of the losses. The cash almost
entirely replaced the accounts receivable in the asset column, cushioning the company from suffering
a large loss. We resolve issues three and four in favor of the judgments.

 Having resolved all issues in favor of the judgments, we affirm the judgments.



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed on Both Causes

Filed: July 26, 2001

Do Not Publish
1. Which documents Evans challenges on appeal is not clear. The record references in his brief
to "several instances of inconsistent information on various forms on Appellant's personnel file" do
not correspond to instances in which Evans made objections at trial. It is not clear that Evans has
preserved the error presented or presents the error he preserved. See Tex. R. App. P. 33.1(a),
38.1(h); Tex. R. Evid. 103. We will nonetheless consider generally the personnel documents
referring to the identity of Rachella Leggett and Tina Evans admitted over Evans's objection.
2. For purposes of this opinion, the relevant staff includes chief financial officer Mark Cobb,
former general manager Ted d'Atri, office manager Emma Allen, and body-shop office worker
Evona Artzel. These staff members' testimony overlapped significantly and consistently.
3. "Totaled" cars are those declared complete losses because the repairs would be too costly
compared to the value of the vehicle.
4. The only indications in the record (e.g., testimony regarding accounts receivable pending for
unusual and disturbing periods, plus some actually rejected claims) are that these claims were not
paid by the customers' insurers.
5. The charges alleged several individual transactions. Evans does not challenge the evidence to
support any particular transaction.



mily: Times New Roman"> On appeal, Evans also emphasizes the absence of certain evidence. He points to the
lack of definitive proof that parts ordered from Baxter and Auto Trim were not installed and that the
customers' insurance companies never reimbursed Alexander for the payments to Baxter and Auto
Trim. He argues that there was no showing that the alleged thefts rendered the body shop
unprofitable, as he argues theft on such a scale should have done.

 We conclude that the evidence is legally and factually sufficient to support the
convictions. Even with the contrary evidence, the jury could have chosen to rely on evidence that
Evans directed that Alexander's money be sent to Baxter and Auto Trim, companies that he
controlled, for parts that Alexander never received. Whether customers' insurance companies paid
duplicative claims for nonexistent parts has no bearing on the theft charge; (4) the question is whether
Evans deprived Alexander of money in exchange for parts he never intended to deliver. From the
evidence, the jury could have concluded that Evans acquired the funds sent to Baxter and Auto Trim,
through himself and Rachella Evans, whatever her connection to him. Though Alexander gave
Evans authority to purchase parts, the jury could conclude that Alexander never consented to receive
no parts for his money. The total claimed losses of more than $250,000 satisfies the amounts alleged
to have been stolen; the aggregate of the lower ends of the ranges charged is $120,000 and the upper-end aggregate is $300,000. (5)

 Evans's argument regarding the absence of evidence of unprofitability of the body
shop does not withstand scrutiny. Huge losses from theft can coexist with immense profitability. 
More critically, however, the enterprise's profitability is irrelevant; the law does not distinguish
between theft from successful and theft from unsuccessful enterprises. Further, the theft would not
have affected the shop's profitability because the amounts stolen were carried as accounts receivable. 
The absence of a deficit is also explainable from an accounting perspective; after the theft came to
light, Alexander collected on an insurance policy that covered most of the losses. The cash almost
entirely replaced the accounts receivable in the asset column, cushioning the company from suffering
a large loss. We resolve issues three and four in favor of the judgments.