TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00669-CR







Jack Clifford Carter, Appellant


v.


The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NO. 001652, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING





 Appellant, Jack Carter, was indicted for capital murder for hiring Richard Boyd to
murder Albert Woods. Appellant was found guilty of capital murder for remuneration and sentenced
to life imprisonment. Tex. Pen. Code Ann. § 19.03(a)(3) (West 1994). On appeal, appellant asserts
that the evidence of remuneration is neither legally nor factually sufficient. 


FACTUAL AND PROCEDURAL BACKGROUND

 On January 31, 2000, around 9:00 a.m., Albert Woods was shot and killed at a bus
stop outside his apartment complex. Two witnesses saw the shooter leaving the scene. One of the
two witnesses heard the gunshot and saw the shooter jogging away from the scene. This witness
described the shooter as Hispanic or a fair skinned African-American male. The other witness saw
the shooter through a row of bushes. He described the shooter as a man of solid build, either a light-skinned Hispanic or a dark-skinned white man. Both witnesses said the shooter wore a dark, waist-length jacket, dark clothing, and a stocking cap. Neither witness could positively identify Boyd in
a police lineup, but one witness said that the fourth person could be the shooter if his stocking cap
were pulled farther down. The fourth person in the lineup was Richard Boyd. 

 Two men testified that appellant had approached them separately to kill Albert
Woods. The first of these men, Redgrick "Reggie" Norton, testified that he had known appellant for
three or four years. He testified that appellant and Woods had been lovers for nine years, but
separated in November 1999 after a physical altercation. Norton testified that appellant talked about
Woods frequently during December 1999 and paid Norton to spy on Woods during that same time
period. Norton took Woods out on several dates at appellant's behest and on appellant's tab,
reporting back to appellant each time. In addition, appellant paid Norton to accompany him on ten
to fifteen trips in which the two followed Woods and spied on him. Overall, appellant paid Norton
over $1000 for his services. Appellant eventually told Norton he wanted to kill Woods. Norton told
appellant he would do it for $30,000. After appellant said he would do it himself, Norton said he
wanted nothing more to do with the matter. Appellant quickly said he was not going to kill Woods. 
 Joshua Dillard was the second man to testify that appellant approached him about
killing Woods. He testified that he met appellant in December 1999 while working as a stripper at
a club. The two developed a social relationship, and appellant told him about his breakup with
Woods. Appellant asked Dillard to beat up Woods. Dillard asked to be paid for such work, and
appellant agreed. Appellant gradually requested greater and greater violence be done to
Woods--starting with beating him up and progressing to throwing acid on him, breaking his legs,
and shooting him in the testicles. Dillard testified that he suggested he should just kill Woods. 
Appellant agreed and set the price for the act at $5,000. 

 Dillard testified that appellant gave him a revolver as a down payment for the murder. 
Dillard requested a deer rifle to commit the murder and appellant told him he would get one. 
Appellant familiarized Dillard with Woods and his habits by taking him to see Woods at his job at
a department store cosmetics counter, spying on Woods's current boyfriend, and visiting Woods's
apartment complex. The two set a date for the murder, but Dillard was arrested before that date. 
While in custody, Dillard told police officers of the plot to kill Woods and the police then warned
Woods of the threat. Dillard had been arrested in January 2000 and was under indictment for several
offenses at the time of the trial. 

 Carey Taylor, Dillard's roommate before the murder, also testified for the State. He
testified that Dillard moved in with him in January 2000, and that shortly afterwards he saw cocaine
and a gun in Dillard's room. The roommate told Dillard to get rid of the items, and Dillard returned
the gun to appellant. The roommate also testified that Dillard told him he had been hired to kill
someone. The roommate reported Dillard to the police the next day. 

 Three co-workers of Woods testified about the relationship between appellant and
Woods. One co-worker testified that appellant spoke to her numerous times about his breakup with
Woods; she described appellant as being "obsessed" with Woods. Another co-worker testified that
she saw appellant at their workplace in November 1999, and that when she told Woods this he
became very agitated. This witness further testified that Dillard entered the store and purchased
some perfume from Woods. She testified that Boyd, the individual charged with murdering Woods,
had come into the store and spoken to Woods on two occasions after appellant and Woods broke up. 
A third co-worker testified that appellant had stood outside Woods's workplace three days in a row,
and that he once gave her a description of Woods and asked her to go inside and see whether Woods
was there. 

 The manager of the apartment complex where Woods lived testified that appellant
came by and asked to be shown the same apartment Woods had been shown a week earlier. The
manager said that appellant seemed more interested in getting information about Woods than about
the apartment. She also testified that a man named "Reggie" visited Woods some time after he
moved into the complex in mid December 1999.

 Noel Arredondo, a friend of both Reggie Norton and appellant, testified that appellant
talked a great deal about Woods, specifically about a physical fight he had with Woods in November
1999. Arredondo testified that appellant told him he should have killed Woods in that fight. He
further testified that two days before the murder appellant told him that he wanted to kill Woods. 

 James Grappe, an acquaintance of appellant for several years, testified for the state
that appellant was the owner of a gym up until a few months before Woods was killed. He testified
that appellant asked him to cash a check for approximately $7500 three or four days before Woods's
death. He said he reluctantly agreed to cash it but told appellant that he was going to wait for the
check to clear before giving him the cash. Appellant called Grappe every day asking whether the
check had cleared and whether he could get the money. The check had not cleared by the time of
Woods's death. Grappe contacted the police when he heard Woods had been killed, and the money
from the check was eventually taken by the police as evidence.

 Two witnesses testified that Boyd had instructed them to provide him with a false
alibi for the morning of Woods's murder. The first of these witnesses, Frank "Jasmine" Ramirez,
testified to being a good friend of Boyd's. Ramirez testified that Boyd invited him and his "fiancé" (1)
to spend the night with him and appellant at a motel. At the motel, appellant said he had to go to
sleep because he and Boyd had things to do the next day. The next morning, January 31, 2000,
appellant woke Ramirez and his "fiancé" early. Ramirez testified that Boyd was wearing dark pants,
a black jacket, and a black beanie. All four men left the motel in appellant's car. Ramirez and his
"fiancé" were dropped off first, but Boyd told them to say that he (Boyd) had been dropped off first
at Ladonn Simpson's house if anyone asked. (2) Ramirez originally gave the police Boyd's false alibi
but later withdrew it and gave the account above.

 Angela Harris also testified that Boyd asked her to provide him with a false alibi. 
Harris testified that appellant and Boyd arrived at the house on Ponciana Street, where she lived with
Ladonn Simpson, around 9:40 or 9:45 on the morning of the murder. Boyd told her to say he had
been at the house since 8:00 or 8:30 that morning if anyone asked. She testified that appellant and
Boyd went outside and when Boyd returned indoors, he had a rifle wrapped in a blanket. Harris
testified that Boyd was wearing blue jeans and a blackish jacket.

 A deputy medical examiner testified that the cause of Woods's death was a gunshot
wound to the head. A criminalist testified that he found lead residue inside one of the pockets of the
jacket worn by Boyd at the time he was arrested. He noted that while lead residue might come from
a recently fired firearm, it might also come from a number of other sources. A forensics firearms
examiner testified that it was his opinion that the bullets used to kill Woods were .44 special caliber
Winchester silver tips consistent with either .44 special or .44 Remington magnum cartridges. He
further testified that if the firearm used to shoot Woods was a .44 special, then it would have to have
been a Charter Arms revolver because that is the only gun that fits those characteristics. 

 Woods's father also testified for the State. He recalled meeting appellant a few times
when appellant accompanied his son to the father's home. Woods's father testified that he had
owned a Charter Arms Bulldog .44 special revolver, which he kept fully loaded at home, in plain
view, on his wife's dresser. Since his son's death, he has been unable to find the revolver.

 Austin Police Officer Cardenas testified about his arrest of Boyd and his search for
appellant. Cardenas was assigned to watch the house on Ponciana Drive in connection with the
investigation into the murder of Woods. Cardenas saw Boyd, wearing dark pants and a knee-length
dark coat, enter the house. Cardenas arrested Boyd as he exited the house and later helped execute
a search warrant for the house. While searching the house, Cardenas told Simpson that there was
a reward for information leading to appellant's arrest. Simpson contacted Cardenas a few days later
and told him where he could find appellant. Using that information, Cardenas located and arrested
appellant. 

 On February 1, 2000, Austin Police Detective Ehlert searched the motel room
appellant and Boyd stayed in the night before Woods's murder. Ehlert found a number of papers,
including a bus route map and schedule and a note pad that had "Richard Boyd" written on it. He
also found a hand-drawn map of what appeared to be Woods's apartment complex. There was an
envelope with the names "Reggie Norton" and "Noel" and a phone number for Noel written on it. 

 Austin Police Detective Gerrish was responsible for overseeing the Woods's murder
investigation. She was part of the team that searched the house on Ponciana Drive and testified that
she found a photograph with "Cliff" and a phone number written on it, a bill addressed to Boyd, and
a black knit cap. Simpson told her the cap belonged to Boyd. Gerrish testified that appellant went
by the name Cliff. Gerrish also found a pawn ticket in the trash for a Remington rifle in Boyd's
name. She found rifle ammunition in a bag with Boyd's belongings. No fingerprints were identified
on items seized in the search. Two days later, detectives seized a rifle from the Doc Holliday
pawnshop with the same serial number as that on Boyd's pawn ticket.

 Gerrish also testified about a two-hour videotaped statement appellant made while
speaking to Gerrish and another detective. (3) A large portion of the tape is a detailed account of
appellant's relationship with Woods. He said he knew Dillard but refused to admit he knew Boyd,
referring to him only as "that guy." He denied hiring anyone to kill Woods or wanting to kill Woods
himself. However, at one point appellant made reference to having paid somebody to kill Woods. 
Gerrish testified that she had not suggested to appellant that this was a murder for hire in the course
of her interview with him. Additionally, he admitted being present when Woods was killed saying,
"[I]t wasn't supposed to happen that way." Finally, he asked the detectives how long it would take
to plead guilty and get the case over with.


DISCUSSION

 On appeal, appellant complains that the evidence is both legally and factually
insufficient to support his conviction for capital murder for remuneration. Determining the legal and
factual sufficiency of the evidence requires the implementation of separate and distinct legal
standards. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). A legal sufficiency review
calls upon the reviewing court to view the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Staley v. State, 887
S.W.2d 885, 888 (Tex. Crim. App. 1994). Any inconsistencies in the evidence should be resolved
in favor of the verdict. Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). 

 The standard of review is the same in both direct and circumstantial evidence cases. 
King v. State, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995); Green v. State, 840 S.W.2d 394, 401
(Tex. Crim. App. 1992). The State may prove its case by circumstantial evidence if it proves all of
the elements of the charged offense beyond a reasonable doubt. Easley v. State, 986 S.W.2d 264,
271 (Tex. App.--San Antonio 1998, no pet.) (citing Jackson, 443 U.S. at 319). The sufficiency of
the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need
not establish the guilt of the accused. Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim. App.
1987). All the evidence the jury was permitted to consider, properly or improperly, must be taken
into account in determining the legal sufficiency of the evidence. Garcia v. State, 919 S.W.2d 370,
378 (Tex. Crim. App. 1994); Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993);
Rodriguez v. State, 939 S.W.2d 211, 218 (Tex. App.--Austin 1997, no pet.). 
 The jury is the exclusive judge of the facts proved, the weight to be given the
testimony, and the credibility of the witnesses. See Tex. Code Crim. Proc. Ann. § 38.04 (West
1979); Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995); Adelman v. State, 828
S.W.2d 418, 421 (Tex. Crim. App. 1992). The jury is free to accept or reject any or all of the
evidence presented by either party. Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). 
The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. Welch
v. State, 993 S.W.2d 690, 693 (Tex. App.--San Antonio 1999, no pet.); Hernandez v. State, 939
S.W.2d 692, 693 (Tex. App.--Fort Worth 1997, pet. ref'd). Moreover, the reconciliation of
evidentiary conflicts is solely within the province of the jury. Heiselbetz v. State, 906 S.W.2d 500,
504 (Tex. Crim. App. 1995). 

 Addressing the legal sufficiency claim and viewing the evidence in the light most
favorable to the verdict, we hold that the jury could have reasonably concluded that appellant was
consumed by thoughts of Woods after Woods broke off their relationship, that appellant obtained
Woods's father's gun, which was used as the murder weapon, that he hired Boyd to kill Woods, that
he planned to pay Boyd for the murder with money from a check he was trying to cash at the time
of the murder, that he familiarized Boyd with Woods's habits, had Boyd approach Woods socially
at Woods's workplace, and gave Boyd a rifle as a down payment for the murder. The record
contains evidence that appellant and Woods had been in a relationship that ended badly and that
appellant was obsessed with Woods and Woods's activities after the break-up. Testimony that
appellant spoke frequently of Woods and of wanting to harm Woods, as well as testimony from two
men who said appellant offered them money to kill Woods, could have led the jury to conclude that
appellant finally succeeded in hiring Boyd to do the killing after the other two potential killers had
backed out or been arrested before consummating the crime. Descriptions of the shooter given by
the witnesses near the scene of the crime matched Boyd's appearance, and lead residue was found
in Boyd's jacket pocket. Testimony by friends place Boyd and appellant together the night before
and the morning of Woods's killing. The jury could have further concluded that the rifle Boyd
pawned the day of the murder was a down payment for the killing and that the rest of the payment
was to come from the check that appellant anxiously waited to clear in the days before the killing. 
Considering appellant's videotaped statement that he was at the scene when Woods was killed and
appellant's reference to having hired someone to kill Woods, the jury could have logically concluded
that appellant hired Boyd to kill Woods. Given the evidence presented at trial, a rational trier of fact
could have indeed found the essential elements of murder-for-hire beyond a reasonable doubt. Thus,
we overrule appellant's first issue.

 In determining the factual sufficiency of the elements of the offense, the reviewing
court views all the evidence in a neutral light, without the prism of "in the light most favorable to
the prosecution." Johnson, 23 S.W.3d at 6-7. The court reviews the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compares it with the evidence
that tends to disprove that fact. Id. In conducting its factual sufficiency review, an appellate court
reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's
determination. Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). The court, however,
does not substitute its judgment for that of the jury and should set aside the verdict only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Id. at 129.
Furthermore, the appellate court may not reverse a jury's decision simply because it disagrees with
the result. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 

 Applying the factual sufficiency test to all the evidence in this case, we cannot say
the verdict rendered by the jury is so contrary to the overwhelming weight of the evidence to be
clearly wrong and unjust. The defendant did not testify, nor did the defense put on any evidence. 
Based on all the evidence, taken as a whole, we hold the evidence is factually sufficient to sustain
the jury's verdict. Therefore, we overrule appellant's second issue.

CONCLUSION

 Having overruled both of appellant's issues, we affirm the judgment of the trial court.



 

 David Puryear, Justice

Before Chief Justice Aboussie, Justices Patterson and Puryear

Affirmed

Filed: December 19, 2002

Do Not Publish
1. While Ramirez referred to his partner as his "fiancé" we point out that same-sex marriages
are not recognized in Texas. 
2. Ladonn Simpson lived with Angela Harris, among other people, in a house on Ponciana
Street.
3. The jury was shown this videotape in the course of the trial.