Rhonda 



 NO. 12-01-00019-CR



IN THE COURT OF APPEALS



TWELFTH COURT OF APPEALS DISTRICT


 

TYLER, TEXAS


 


HELENA THOMPSON,
§
 APPEAL FROM THE 241ST

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 SMITH COUNTY, TEXAS






 

 Appellant Helena Thompson appeals her conviction for the offense of murder for which she
was sentenced to forty years in prison. Appellant presents six issues for our consideration. We
affirm. 


Background

 Appellant married Lin Thompson ("Lin") about two weeks after meeting him in the fall of 1999. 
In the days and weeks prior to his death on December 9, 1999, Lin told several friends and
acquaintances that he was considering divorcing Appellant. He intended to tell Appellant on the night
of December 8.

 That night, Appellant and Lin went to a club where they argued throughout the night. Both
were drinking alcoholic beverages and became intoxicated. Several witnesses testified that Appellant
was known to have a violent temper when she had been drinking alcohol. Appellant and Lin left the
club before midnight. Shortly after midnight, Appellant called 911 from their home and reported that
her husband had been shot by an intruder. The police arrived approximately eight minutes later. 

 Officers Chris Hudson ("Hudson") and Fred Johnson ("Johnson") of the Whitehouse Police
Department were dispatched to the Thompson residence at 12:05 a.m. to investigate a burglary in
progress. Both testified that they did not see any cars or any person on foot leaving the area of the
Thompson residence. When the officers arrived at the residence, they found the front door open. They
entered the house with their weapons drawn, searching for an intruder. Hudson could hear a woman
crying in the back of the house, so he announced himself. 

 Hudson and Johnson told the jury that as they started down the hall toward the woman's voice,
they could see Lin's feet through the open door. When Hudson entered the bedroom, he saw Appellant
kneeling beside Lin, who was lying on his back on the floor. A broken mirror was on the floor, and
blood was splattered on the broken glass and around Lin. Hudson had Johnson remove Appellant from
the room immediately. 

 Hudson testified that Lin's face was swollen and discolored, and Lin did not have a pulse. 
When he tried to tilt Lin's head back in an attempt to open an airway, Hudson noticed that the carpet
under Lin's head was blood-soaked and that the blood was clotted. Hudson removed a cloth that
Appellant had been holding over Lin's neck and noticed a hole in the middle of his neck. Hudson
testified that when he started giving Lin chest compressions, a large amount of blood came out of the
wound and out of Lin's mouth. 

 Johnson testified that he left Appellant in the care of two dispatchers who were riding along
with him and Hudson. Once outside, Appellant alternately screamed hysterically, beat her fists on the
ground, dug or clawed at the ground, and tried to force her way back into the residence. Appellant was
never able to give any information to any of the police officers which they were able to use to search
for a suspect. Johnson returned to the bedroom where he noticed a gun sticking out from under some
clothing lying on the floor near Lin's feet. Johnson also observed that a sliding glass door in the
bedroom was standing open. 

 After Johnson removed Appellant from the bedroom, Appellant slept for a couple of hours in
a patrol car before she was transported to the Sheriff's Office by Sergeant Charlie Baker ("Baker"). 
Appellant ultimately refused to give a written statement, but she had already told Baker that she had
held the gun after the shooting. Also, Appellant told Baker that she had accidentally broken the
windshield of the truck when she had to brace her feet against it because the truck's faulty brakes had
nearly caused an accident. 

 On the morning of the murder, and over the next couple of days, Appellant told several people
her version of what had happened when Lin was killed. She consistently claimed to have heard a pop
and seen the shadow of an intruder. However, her story varied as to whether she was inside the house
or outside when she heard the pop, whether Lin called her name before the pop, and whether she saw
the shadow of the alleged intruder before or after she heard the pop. 

 Brad Vanderbilt ("Vanderbilt"), a paramedic, arrived at the residence at 12:23 a.m. As he
walked down the hall toward the bedroom, he could see Lin's legs through the open door. Vanderbilt
testified that he saw an entrance gunshot wound just below Lin's Adam's apple, and when he rolled Lin
over to look for an exit wound, he noticed that lividity had set in on the back side of Lin's body,
indicating that he had been dead for at least fifteen minutes. Vanderbilt also told the jury that the
amount of clotting on the back of Lin's head indicated to him that the wound was at least twenty-five
minutes old. Vanderbilt ceased resuscitation efforts at that point. 

 Several Smith County Sheriff's Department officers went to the Thompson residence that night
to aid in the crime scene investigation. Lieutenant Jason Waller ("Waller") of the Smith County
Sheriff's Department testified that he performed an atomic absorption analysis test on Appellant's
hands to determine whether she had gun powder residue on her hands. As he looked at Appellant's
hands while conducting the test, Waller noticed an area of redness at the base of her right thumb that
he believed was consistent with an injury caused by firing a .357 caliber handgun. Waller told the jury
that he observed blood on Appellant's jeans and a small amount of blood on her hands.

 Waller testified that the gate to the privacy fence outside the master bedroom was closed and
that there were no visible footprints in the dewy grass outside the open sliding glass door. He also told
the jury that when he walked on the grass, he left visible footprints. Waller walked through the house
and noticed that although the house was cluttered and unkempt, no items of value appeared to be
missing. He saw a TV, a VCR, more than one computer, more than one cell phone, some change, and
some Christmas presents in the house. 

 From the hallway, Waller could see Lin's body on the bedroom floor. Once in the bedroom,
Waller noted that Lin had removed his boots and emptied his pockets onto a night stand. The witness
told the jury that Lin would have had to pass by the open sliding glass door to reach the night stand. 
Waller saw a mop or broom handle on the floor beside the track of the sliding glass door. Waller
observed that plaster and the doorstop had been knocked from the wall behind the bedroom door. The
bedroom doorknob had been pushed into the plaster behind the door, cracking it. Waller told the jury
that it appeared the dresser mirror had fallen and shattered when the door hit the wall. Also, the cover
from a smoke detector in the hall was lying on the bedroom floor near the telephone, which was bloody. 
 Waller testified that the gun lying at Lin's feet was a .357 magnum containing five live rounds
of ammunition and one fired round. A holster was lying near the gun, and Waller later recovered a
bullet from the bedroom wall behind Lin's head. Waller found no fingerprints or blood on the gun. 
He found several blood-stained towels near Lin's body and a blood-stained towel in the master
bathroom. He also observed water droplets in the sink basin. 

 Waller testified that there was a pickup truck parked in front of the Thompson residence. He
noticed several items that appeared to have come from inside the truck were scattered about the ground
outside the truck. He also observed that the inside of the truck was in disarray and the windshield was
shattered. Several days later, Waller observed shoe prints on the windshield which corresponded with
the shattered area. 

 Juan Rojas ("Rojas"), a DPS chemist, analyzed the atomic absorption analysis kit which Waller
had used on Appellant's hands. Rojas testified that the test results did indicate primer gunshot residue
but not in sufficient amounts to conclude that Appellant had fired a gun or been in close proximity to
a gun which was fired. Rojas told the jury that such low levels of primer gunshot residue could not
exclude the possibility that a person had fired a gun but, rather, might indicate that a person who had
fired a gun had washed his hands with water, put his hands in his pockets, run his hands through his
hair, or otherwise wiped off his hands. 

 Alan Weckerling, an independent accident investigator and forensic scientist, tested the shirt
Appellant was wearing at the time of the murder for primer gunshot residue. He found none. 

 Dr. Edward Bolesta ("Bolesta"), who worked as a forensic consultant for Smith County at the
time of the murder, examined Appellant's right hand and noted the injury to the base of her thumb. 
Bolesta also performed an autopsy on Lin's body. Bolesta testified that stippling around the wound to
Lin's neck indicated that the weapon was between two and four feet from Lin when it was fired. 
Bolesta told the jury that the bullet perforated Lin's spinal column, and, therefore, Lin would have been
instantly incapacitated and would have collapsed immediately when he was shot. Bolesta found no
evidence of blood aspirated into Lin's lungs and concluded that Lin did not take a breath after he was
shot. 

 John Donahue ("Donahue"), a DPS criminalist, tested the blood on the vest and jeans that
Appellant was wearing on the night of the murder and determined that at least some of it was Lin's
blood. Donahue also testified that the blood on the cream colored towel found in the master bathroom
was Lin's blood. 

 Bob Henderson ("Henderson"), a private consultant specializing in bloodstain pattern analysis,
examined the vest and jeans Appellant was wearing on the night of the murder. Henderson testified
that the high velocity blood spatter on Appellant's jeans indicated that she was very close to Lin when
he was shot or that he had expectorated blood onto her after he was shot. 

 Glenn Johnson ("Johnson"), a DPS firearms examiner, testified that the .357 caliber handgun
found near Lin's feet was the murder weapon. Johnson told the jury that the recoil from the murder
weapon, loaded with magnum ammunition as it was when it was recovered, would be "quite severe"
or "pretty fierce" and, if the gun were not gripped properly when it was fired, it would injure the hand
of the shooter. 

 Appellant testified in her own behalf. She told the jury that the bedroom was not in a state of
disarray when she left the house that morning. She repeated the story of an intruder and denied that she
shot her husband. 


Sufficiency of the Evidence

 In her first and second issues, Appellant contends that the evidence is legally and factually
insufficient to support the conviction.

Legal Sufficiency

 A person commits the offense of murder if he intentionally or knowingly causes the death
of an individual. Tex. Pen. Code Ann. § 19.02(b) (Vernon 1994). The standard of review for legal
sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's
verdict, any rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560
(1979); Whitaker v. State, 977 S.W.2d 595, 598 (Tex. Crim. App. 1998), cert. denied, 525 U.S.
1108, 119 S. Ct. 878, 142 L. Ed. 2d 777 (1999). An appellate court should uphold the jury's verdict
"unless it is found to be irrational or unsupported by more than a mere modicum of evidence." 
Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). All conflicts in the evidence should
be resolved in favor of the verdict, and every reasonable inference indulged. Sneed v. State, 803
S.W.2d 833, 837 (Tex. App.- Dallas 1991, pet. ref'd).

 Sufficiency of the evidence should be measured by the elements of the offense as defined by
the hypothetically correct jury charge for the case. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim.
App. 1997) (en banc). Such a charge would be one that accurately sets out the law, is authorized by
the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict
the State's theories of liability, and adequately describes the particular offense for which the
defendant was tried. Id. 

Application

 Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier
of fact could have found beyond a reasonable doubt that Appellant committed the offense of murder. 
The evidence showed that on the night of his murder, Lin intended to tell Appellant that he wanted a
divorce. There were no signs of an intruder. Once the couple reached their residence, Lin emptied his
pockets and took off his boots in their bedroom, indicating that no intruder was present. The first police
officers to respond to the scene did not encounter anyone leaving the area on foot or in a vehicle. There
were no signs of forced entry into the house and no footprints in the dewy grass outside the sliding glass
door to the master bedroom. 

 The evidence of high velocity blood spatters on Appellant's jeans indicates that she was near
Lin when he was shot. Finally, the bruise on Appellant's hand which was noted by Waller and Bolesta
was consistent with having fired the .357 caliber handgun loaded with magnum ammunition. 

 Because the jury's verdict is not irrational and was supported by more than a mere modicum
of evidence, Appellant's first issue is overruled. 

Factual Sufficiency

 When reviewing the factual sufficiency of the evidence, we must ask whether a neutral
review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is
so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof. Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000). We review the evidence weighed by the jury that tends to
prove the existence of the elemental fact in dispute and compare it with the evidence that tends to
disprove that fact. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). We review the fact
finder's weighing of the evidence and are authorized to disagree with the fact finder's determination. 
Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). This review must employ appropriate
deference to prevent an appellate court from substituting its judgment for that of the fact finder, and
any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the
weight and credibility to be given to the testimony of the witnesses. Jones, 944 S.W.2d at 648.

 The degree of deference a reviewing court provides must be proportionate with the facts it
can accurately glean from the trial record. Johnson, 23 S.W.3d at 8. A factual sufficiency analysis
can consider only those few matters bearing on credibility that can be fully determined from the cold
appellate record. Id. Such an approach occasionally permits some credibility assessment but usually
requires deference to the jury's conclusion based on matters beyond the scope of the appellate court's
legitimate concern. Id. Unless the available record clearly reveals a different result is appropriate,
an appellate court must defer to the jury's determination concerning what weight to give
contradictory testimonial evidence because resolution often turns on an evaluation of credibility and
demeanor, and those jurors were in attendance when the testimony was delivered. Id. This evidence
is then accorded the appropriate consideration by the reviewing court in the context of its overall
analysis of the relevant evidence. Id. at 8-9.

 The reviewing court must always remain cognizant of the fact finder's role and unique
position, a position that the reviewing court is unable to occupy. Id. The authority granted in Clewis
to disagree with the fact finder's determination is appropriate only when the record clearly indicates
such a step is necessary to arrest the occurrence of a manifest injustice. Id. Otherwise, due
deference must be accorded the fact finder's determinations, particularly those determinations
concerning the weight and credibility of the evidence. Jones, 944 S.W.2d at 648-49. 

Application

 Our neutral review of the evidence, both for and against the finding of guilt, neither
demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's
determination, nor that the proof of guilt, although adequate if taken alone, is greatly outweighed by
contrary proof. 

 Appellant testified that she shattered the windshield of the pickup truck by bracing her feet
against it during a near-accident. However, on the night before Lin was murdered, Lin and Appellant
argued at a club where both were drinking alcoholic beverages. There was evidence that Appellant had
a violent temper when she drank, and the jury could have concluded that the multiple footprints on the
shattered windshield were more consistent with an act of anger than with Appellant's bracing herself. 
 Though Henderson testified that the high velocity blood spatter on Appellant's jeans could
indicate either that she was very close to Lin when he was shot or that he had expectorated blood onto
her after he was shot, Bolesta testified that the gunshot wound to Lin's neck would have caused him
to be immediately incapacitated and that he did not breathe after he was shot. 

 The fact that there was no gunpowder residue on Appellant's shirt certainly weighs against her
having fired the murder weapon. Moreover, Rojas testified that the results from the atomic absorption
analysis test of Appellant's hands did not reveal primer gunshot residue in sufficient amounts to
conclude that Appellant had fired a gun or been in close proximity to a gun which was fired. However,
Rojas also told the jury that such low levels of primer gunshot residue could not exclude the possibility
that a person had fired a gun. Rojas testified that a person who washed his hands with water, put his
hands in his pockets, ran his hands through his hair, or otherwise wiped off his hands after he fired a
gun could wipe off enough primer gunshot residue to produce such test results. 

 There is some evidence that Appellant washed or wiped her hands after Lin was shot. Appellant
was on the line with the 911 dispatcher for eight minutes and twenty seconds before police officers
arrived at the residence. During the 911 call, Appellant was away from the phone for three minutes and
twenty seconds-ample time to wash her hands. The State's theory that Appellant did, in fact, wash her
hands during the lull in the 911 call is corroborated by the fact that a towel with Lin's blood on it was
found in the master bathroom and the sink basin was wet despite the fact that Appellant claimed she
had not been in the bathroom after the shooting. Also, there was testimony that Appellant rummaged
around in the seat of the truck looking for cigarettes, that Appellant beat her hands on the ground, and
that Appellant dug at the ground with her hands. The jury could have concluded that any or all of these
actions might have wiped Appellant's hands clean of primer gunshot residue. 

 Though the gun had no fingerprints or blood on it, Appellant told Baker that she had handled
the gun after the shooting. The telephone which she had handled was bloody. This apparent
inconsistency could have damaged Appellant's credibility with the jury. 

 Appellant testified that an intruder had entered the house and shot her husband, but she was
unable to provide the investigating officers with any information that would assist them in searching
for a suspect. She also testified that the bedroom was not in a state of disarray when she left the house
the day before the murder. However, no version of the story Appellant told after the murder included
an explanation of how or when the room was ransacked by the alleged intruder. Moreover, none of the
officers who testified found any signs of an intruder. The jury could have logically concluded that if
an intruder had ransacked the bedroom, the sliding glass door would have been open and the mirror
shattered at the time Lin entered the bedroom. Furthermore, the jury could have concluded that Lin
would not walk past the open sliding glass door and around the shattered mirror to empty his pockets
and take off his boots. Thus, the jury could have disbelieved Appellant's testimony regarding the
alleged intruder.

 Because the evidence, both for and against the finding of guilt, neither demonstrates that the
proof of guilt is so obviously weak as to undermine confidence in the jury's determination, nor that the
proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof, the evidence
is factually sufficient to support Appellant's conviction. Therefore, Appellant's second issue is
overruled. 


The Right to Confrontation

 In her third issue, Appellant contends that her right to confrontation was violated when she was
not allowed to question a witness about his agreement with the State for immunity from prosecution
in exchange for his testimony, about the source of illegal narcotics that he delivered to Lin, or about
whether he possessed or delivered illegal narcotics to Lin during Lin's prior marriage.

 Sean Thompson ("Sean"), Lin's brother, testified for the State at trial. The prosecutor elicited
from Sean the fact that he had an agreement with the State that he would not be prosecuted for any
matters about which he testified at the trial if those matters involved narcotics. Sean told the jury that
several times during the three-month period leading up to Lin's death, Lin gave him money with which
to purchase cocaine for him and Lin to divide. The witness further testified that at least twice during
that same time period, he purchased marihuana to divide with his brother by the same arrangement. 
When Appellant asked Sean on cross-examination from whom he purchased the cocaine which he
shared with his brother, the trial court sustained the State's objection to the relevancy of that
information, and the question was not answered. Appellant asked Sean whether he had a "deal" with
the State in exchange for his testimony, and, after the trial court overruled the State's objection, Sean
answered that he did. Sean told the jury that he realized that but for the immunity agreement, he could
possibly go to jail for the possession and delivery of narcotics about which he had testified. 
Subsequently, outside the presence of the jury, Appellant made an informal bill of exception regarding
evidence he wished to elicit from Sean about the source of the cocaine. 

 Later in the trial, Appellant called Sean to testify. On a bill of exception, Appellant asked
whether Sean ever possessed cocaine in Lin's presence when Lin was married to his prior wife and
whether Sean ever delivered cocaine to Lin during the prior marriage. Sean invoked his Fifth
Amendment right not to incriminate himself in response to both questions. Before Appellant rested her
case, the State informed the trial court that any delivery or possession of cocaine by Sean during the
time of Lin's prior marriage would be covered by the immunity agreement, and that Sean was available
to be recalled by Appellant and give answers to those questions. Appellant did not recall him. 

 Appellant now argues that her right to confront and cross-examine Sean was violated. In all
criminal prosecutions, state as well as federal, the accused has a right, guaranteed by the Sixth and
Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses
against him." U.S. Const. amend. VI.; Lilly v. Virginia, 527 U.S. 116, 123, 119 S. Ct. 1887, 1893,
144 L. Ed. 2d 117 (1999) (plurality opinion). The central purpose of the Confrontation Clause is to
ensure the reliability of the evidence against an accused through rigorous testing in an adversary
proceeding before the trier of fact. Maryland v. Craig, 497 U.S. 836, 845, 110 S. Ct. 3157, 3163,
111 L. Ed. 2d 666 (1990). Confrontation enhances the accuracy of the fact-finding process because
(1) a witness who testifies under oath will be impressed with the seriousness of the matter and the
possibility of a penalty for perjury; (2) cross-examination, which has been described as "the greatest
legal engine ever invented for the discovery of truth," is available for testing the credibility of the
witness; and (3) the demeanor of the witness can be considered by the jury in assessing credibility. 
California v. Green, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935, 26 L. Ed. 2d 489 (1970) (citations
omitted). 

 The constitutional right of confrontation is violated when appropriate cross-examination is
limited. Hurd v. State, 725 S.W.2d 249, 252 (Tex. Crim. App.1987). The scope of appropriate
cross-examination is necessarily broad. Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). 
A defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a
motive, bias or interest for the witness to testify. Lewis v. State, 815 S.W.2d 560, 565 (Tex. Crim. App.
1991). A defendant is permitted to elicit any fact from a witness intended to demonstrate that witness's
vulnerable relationship with the State. Alford v. United States, 282 U.S. 687, 692, 51 S. Ct. 218, 219,
75 L. Ed. 624 (1931); Carroll, 916 S.W.2d at 500. 

 In the instant case, Appellant contends that she was not allowed to cross-examine Sean
regarding his deal with the State for immunity from prosecution. However, the record reflects that the
State elicited from Sean that he had been granted immunity from prosecution in exchange for his
testimony. Furthermore, Appellant asked Sean specifically whether he had a deal with the State
whereby he would not be prosecuted in exchange for his testimony, and Sean testified that he did.
Appellant's contention that she was not allowed to cross-examine Sean about his immunity agreement
is wholly without merit.

 Next, Appellant argues that she should have been allowed to cross-examine Sean about the
source of the cocaine he bought for his brother when he was married to Appellant and about whether
and from what source he bought cocaine for Lin when Lin was married to his prior wife. In both
instances Appellant made an informal bill of exception stating what questions she wished Sean to
answer. 

 To preserve error in the exclusion of evidence, a party must make a record through a bill of
exception, formal or informal, of the evidence the party desires admitted. See Richards v. Comm'n
for Lawyer Discipline, 35 S.W.3d 243, 252 (Tex. App.- Houston [14th Dist.] 2000, no pet.). An
informal bill of exception will suffice as an offer of proof when it includes a concise statement of
counsel's belief of what the testimony would show. Love v. State, 861 S.W.2d 899, 901 (Tex. Crim.
App. 1993). When counsel intends to rely upon an informal bill to preserve error, the bill must
include a summary of the proposed testimony. Id. Furthermore, no error is shown in the exclusion
of evidence unless the record shows not only what the evidence would have been, but also its
relevance. Mollinedo v. Texas Employment Comm'n, 662 S.W.2d 732, 739 (Tex. App.- Fort
Worth 1983, writ ref'd n.r.e.).

 Regarding the cocaine that Sean purchased for Lin in the months leading up to his death,
Appellant merely recited into the record what questions she would have posed. She gave no indication
what she expected the testimony might be. Appellant wholly failed to provide the trial judge with a
concise statement regarding the content of the testimony she proposed to elicit from the Sean. 
Because there is no "concise statement regarding the content of the testimony" Appellant proposed
to elicit from Sean in the record, error, if any, is not preserved. 

 Finally, regarding cocaine Sean may have possessed or delivered to Lin during Lin's prior
marriage, Appellant actually posed the questions to Sean, but he invoked his Fifth Amendment right
against self-incrimination and did not answer. Because the record shows only an offer of immunity and
not the trial court's approval, immunity was not established as to any narcotics transactions during Lin's
prior marriage. See Washburn v. State, 448, 299 S.W.2d 706, 707 (Tex. Crim. App. 1956). Therefore,
Sean had a valid Fifth Amendment privilege to invoke, and the trial court did not err by excluding the
evidence. See id. Therefore, Appellant's third issue is overruled. 


Motion for Mistrial

 In her fourth issue, Appellant claims that the trial court erred by denying her motion for mistrial
which was made after at least one juror and a friend or relation (1) of Lin's had out-of-court contact. 

 One morning during the trial, Sherilyn Carter ("Carter"), who was attending the trial along with
some of Lin's relatives, backed her car into one of the juror's cars at the entrance to the parking lot
where the jurors parked. When Carter got out of her car and recognized that the driver of the other car
was a juror, she told him she could not speak to him. Two more jurors were witnesses to the collision
and the conversation between Carter and the other juror. That same morning, Carter and all three jurors
appeared before the trial court and told the court what had happened. All three jurors stated that what
had happened would not affect their jury service in any way. Subsequently, Appellant moved for a
mistrial based on the out-of-court contact between the jurors and Carter. Appellant argued in that
motion and reasserts on appeal that the practice at the Smith County Courthouse of allowing victims'
families to park their cars in the same reserved parking lot where jurors park invites contact between
the two groups. 

 The denial of a motion for mistrial is reviewed under the abuse of discretion standard. See
Trevino v. State, 991 S.W.2d 849, 851 (Tex. Crim. App.1999). A trial court does not abuse its
discretion when its decision lies within the zone of reasonable disagreement. See Montgomery v.
State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). 

 For an accused to have a fair trial, the jury must decide his case based only on the evidence
presented at trial. Robinson v. State, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991). Article 36.22 of
the Texas Code of Criminal Procedure states, "No person shall be permitted to be with a jury while it
is deliberating. No person shall converse with a juror about the case on trial except in the presence and
by the permission of the court." Tex. Code Crim. Proc. Ann. art. 36.22 (Vernon 1981). The
purpose of article 36.22 is to prevent an outsider from saying something that might influence a juror. 
Chambliss v. State, 647 S.W.2d 257, 266 (Tex. Crim. App. 1983). When a juror communicates with
an unauthorized person about the case at trial, we presume the defendant was injured. Robinson,
851 S.W.2d at 230; Green v. State, 840 S.W.2d 394, 406 (Tex. Crim. App. 1992). To invoke this
presumption, the defendant must show the communication involved matters concerning the
defendant's trial. Chambliss, 647 S.W.2d at 265-66. We presume harm even when the
communication does not rise to the level of a full-blown conversation or discussion of the specifics
of a given case. McIntire v. State, 698 S.W.2d 652, 659 (Tex. Crim. App. 1985). If the defendant
proves a discussion involving the case at trial, the State bears the burden of rebutting the
presumption of harm. Robinson, 851 S.W.2d at 230; McIntire, 698 S.W.2d at 659. The State may
rebut the presumption by showing the case was not discussed or nothing prejudicial about the
accused was said. Green, 840 S.W.2d at 406. Even if a prejudicial statement was made to a juror,
it may not require reversal if the juror testifies he or she did not tell any other jurors about the
statement and the statement would not influence the juror in reaching a verdict. Robinson, 851
S.W.2d at 230; Thomas, 699 S.W.2d at 853. The focus is the injury to the accused. Thomas, 699
S.W.2d at 853. If the State shows the accused was not injured, the verdict will be upheld and a new
trial is not required. Green, 840 S.W.2d at 406.

 Whether the parking arrangements for jurors and victims at the Smith County Courthouse
invites contact between the two groups is irrelevant to our disposition of this issue. Appellant has
not shown that the contact between Carter and the jurors "involved matters concerning her trial." 
Furthermore, all three jurors told the trial court their verdict would not be influenced in any way by
the event or the communication. Because Appellant has not shown that the communication between
Carter and the jurors involved her case, she cannot show harm. Therefore, the trial court did not
abuse its discretion by denying the motion for mistrial. Appellant's fourth issue is overruled. 


Improper Prosecutorial Argument In her fifth issue, Appellant claims that the prosecutor made an improper argument during
the guilt/innocence phase of the trial by stating that Appellant almost "jumped out of the courtroom"
when the firearms examiner demonstrated on her in front of the jury how the handgun used in the
murder would have "kicked." In order to preserve error caused by an improper State's jury argument
for appellate review, an appellant must have first made her complaint known to the trial court by a
timely request, objection, or motion that stated the grounds for the ruling that she sought from the
trial court with sufficient specificity to make the trial court aware of the complaint, unless the
specific grounds were apparent from the context. See Tex. R. App. P. 33.1(a)(1)(A). Appellant made
no objection to the prosecutor's argument at trial. Therefore, Appellant has waived the error, if any,
of which she now complains. Accordingly, Appellant's fifth issue is overruled. 

 In her sixth issue, Appellant contends that the prosecutor's argument during the punishment
phase of the trial that she could not "fathom that probation would even be considered in this case"
was improper because it was a statement of the prosecutor's personal opinion or belief. Proper jury
argument must fall into one of four general categories: (1) summation of the evidence; (2) reasonable
deduction from the evidence; (3) response to argument of opposing counsel; and (4) plea for law
enforcement. See Guidry v. State, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). During the
prosecutor's argument, the following transpired: 


 [The prosecutor]: Now, I cannot fathom that probation would even be considered in this case. 


 [Appellant's counsel]: Judge, I'm going to object to what she cannot fathom. That's her-that's improper,
and we ask for an instruction and a ruling.


 [The prosecutor]: It's closing argument, Your Honor.


 The court: It is argument here.


 [Appellant's counsel]: I understand, but "I cannot fathom," Judge, it's a statement of what she cannot
fathom, and that's improper. We can't do that.


 The court: Okay.


 [Appellant's counsel]: She can ask the jury to do whatever they chose to do, but she can't do that. And
that's my objection, Your Honor.


 The court: Okay. Overruled. It is argument in this case.


The prosecutor then repeated the argument and Appellant's counsel asked for a running objection
which the court allowed. 

 Even if the State's argument falls outside the four areas of proper jury argument, an appellant
still must preserve the error by a timely request, objection, or motion that states the grounds for the
ruling that she seeks from the trial court with sufficient specificity to make the trial court aware of
the complaint, unless the specific grounds are apparent from the context. See Tex. R. App. P.
33.1(a)(1)(A). A general objection that an argument is "improper" is usually insufficient to preserve
error. Martinez v. State, 833 S.W.2d 188, 191 (Tex. App.- Dallas 1992, pet. ref'd); see also
Earnhart v. State, 582 S.W.2d 444, 449 (Tex. Crim. App. [Panel Op.] 1979) ("not a proper
argument, not a proper statement" held too general to preserve error as it did not sufficiently apprise
trial court of discernible grounds upon which it was leveled.) By failing to specify the grounds upon
which her objection was based, Appellant waived the error, if any, of which she now complains. 
Therefore, Appellant's sixth issue is overruled. 

 The judgment of the trial court is affirmed. 

 JAMES T. WORTHEN 

 Chief Justice



Opinion delivered January 22, 2003.

Panel consisted of Worthen, C.J. and Ramey, Jr., Retired Chief Justice, Twelfth Court of Appeals, Tyler, sitting by
assignment.

Griffith, J. not participating.



























(DO NOT PUBLISH)
1. It is unclear from the record whether the woman was related to Lin.