# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00588-CR

**Thomas James Negri, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT
### NO. CR5740, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Thomas James Negri guilty of murder and assessed his punishment at twenty years' imprisonment. *See* Tex. Penal Code Ann. § 19.02 (West 2003). Appellant contends that the evidence is legally and factually insufficient to sustain the guilty verdict, and that the State failed to prove that venue was proper in Llano County. We overrule these contentions and affirm the judgment of conviction.

## EVIDENCE

### *Shirley Cowan's Disappearance*

The deceased, Shirley Cowan, was appellant's mother-in-law. Cowan disappeared without a trace in January 2001. The indictment accusing appellant of Cowan's murder was filed in December 2005, and he was tried in July 2007.

At the time of her disappearance, Cowan, a sixty-year-old widow, was living in a trailer park in Austin. Cowan had two daughters, Karen Jack, who lived in Rockport, and Teresa Negri, appellant's wife, who lived with him and their children in Burnet.[1] By all accounts, Cowan had a quick temper and could be difficult to deal with. For example, Cowan did not speak to appellant or Teresa for four years in the mid-1990s as a result of hard feelings arising from a failed business arrangement between Cowan, her late husband, and appellant. In 2000, however, Cowan hired appellant to be the general contractor on a "spec" house she wanted to build on a golf course near Kingsland. By January 2001, the house was nearing completion, but there was testimony that Cowan was not satisfied with the quality of the work, and that she was planning to remove appellant from the job and replace him with her brother-in-law, Nelson Cowan.

Cowan was last seen by Natasha Stieler, Karen Jack's daughter and Cowan's granddaughter, who also lived in Austin. Stieler testified that she was very close to Cowan, spoke to her at least once a week on the telephone, and often visited her. Stieler had dinner at Cowan's residence on Sunday night, January 14, 2001. Stieler testified that she brought two rented movies with her that night and that she and Cowan watched one of them after dinner. They made plans to meet again for dinner on Wednesday night, when they would watch the second movie. Cowan promised to make spaghetti, one of Stieler's favorite dishes, and Stieler saw Cowan take some ground meat from the freezer to thaw.

On Monday or Tuesday, Stieler heard from her mother that, according to appellant, Cowan had called appellant on Sunday night and told him that she had decided to go to "the

---

[1] Cowan's third child, a son, predeceased her. We spell all names as they appear in the reporter's record.

2

islands."[2]  Stieler testified that she found this odd because Cowan had said nothing to her to indicate that she was planning to take a trip, and that she had seen no luggage or other evidence of travel plans.  Stieler was further surprised to hear that Cowan had left her two dogs behind in appellant's care rather than taking them with her, as she always did when she traveled.[3]  Later that week, Stieler borrowed the key to Cowan's trailer from Teresa Negri so she could retrieve her rented movie, which she had left at the trailer in anticipation of the Wednesday night dinner.  Stieler testified that when she entered the trailer, she "knew something was wrong."  Cowan was, according to Stieler, a fastidious housekeeper, but the dirty dishes from the previous Sunday night were still in the sink and the ground meat was beginning to go bad in the refrigerator.

Karen Jack testified that she, too, was surprised to learn that Cowan had suddenly decided to go on vacation.  According to Jack, Cowan would not have left without telling Jack of her plans, and she would not have left her dogs.  Jack also testified that appellant told her that Cowan had instructed him to move her trailer and car from the trailer park.  This concerned Jack because, as she explained, " [Appellant] told me that she was coming back on the 29th.  Where was she going to live and how was she going to get off this airplane if her trailer and her car [were] gone."  Jack testified that appellant and Teresa moved Cowan's trailer and car from the trailer park on January 23.[4]  The evidence shows that they first took the trailer to the building site near Kingsland, and later

---

[2]  There is evidence that Cowan often vacationed in the Cayman Islands.

[3]  The two dogs had belonged to Cowan's late son, and all the witnesses who knew Cowan testified to her great love for the animals.

[4]  John Rucks, the trailer park manager, testified that Cowan's rent was paid, and that she had said nothing to him about leaving.

moved it to their residence in Burnet. Jack testified that appellant later told her that Cowan had instructed him to sell the trailer because she was out of money. On January 31, 2001, Jack called the police to report Cowan missing.

Nelson Cowan testified that he last saw his sister-in-law on January 11, 2001. On that day, he drove Cowan to Kingsland to look at the house under construction. Cowan expressed to him her displeasure with appellant's work—she was "mad as hell"—and her desire to have Nelson finish the project. Nelson also drove Cowan to appellant's house, where she intended to ask Teresa to return the extra key to Cowan's safe deposit box. Nelson testified that Cowan told him she had $300,000 in the box. The bank manager testified that Cowan had leased the safe deposit box in October 2000, and that only Cowan and Teresa Negri were authorized to open it. Bank records showed that Cowan was the only person to open the box until January 16, 2001, when Teresa opened it for the first time. Teresa also opened the box on January 31 and February 14, 2001.

Texas Ranger Matthew Linderman, who led the investigation into Cowan's disappearance, testified that Cowan's telephone records showed that the last call made with her phone was on the night of January 14, 2001, to appellant's phone number. There was no record of Cowan or anyone else using her telephone or her credit cards since that date. The only checks written on Cowan's bank account after her disappearance were signed by appellant, who was authorized to do so.

### Blood at the Kingsland House

Bob Holbrook testified that he was hired by appellant to do the cabinets at the Kingsland house. Holbrook was present when, after the cabinets had been hung and painted, Cowan

4

visited the house with appellant. Cowan did not like the color and demanded that the cabinets be repainted. Holbrook said that appellant told him not to worry and that appellant would pay him to repaint the cabinets. Holbrook testified that he could hear appellant and Cowan talk as they walked through the house that day, and she was "pretty upset about quite a few things in the house." Holbrook testified that Cowan was "real short" and "abusive" with appellant. Holbrook said that Cowan's remarks did not seem to bother appellant, who "just kind of stood back and nodded his head like everything was okay. If she wanted anything redone, it was fine to redo it, you know, everybody be paid, no problems."

Holbrook testified that appellant called him one day when the house was nearing completion and instructed him not to come to work the next day, which Holbrook believed was a Saturday. Appellant told Holbrook that he and Cowan were going to meet to discuss the "finish-ups" and last payment, and that he wanted the meeting to be private. Appellant asked Holbrook to come back on Sunday to finish his work, and Holbrook agreed. Holbrook testified that when he returned to the job on Sunday, he noticed that the cabinets had been dented in several places. He also noticed "speckles" on the cabinets, which he suspected was paint mold. Holbrook saw a large amount of white paint on the unfinished concrete floor of the house. As described by Holbrook and other witnesses, and shown by photographic evidence, this paint formed a trail that ran from the kitchen, through the living room, and into the master bedroom closet. Holbrook testified that he noticed small spots of red or brown color in the paint.

Holbrook testified that he asked appellant, when he arrived at the house that same day, what had happened the day before. According to Holbrook, appellant told him that he and Cowan had "a little altercation in the kitchen." As appellant described it, Cowan "swung at

5

[appellant] with a piece of pipe and he ducked back, she missed him, and she cut her hand on the edge of that cabinet facing and had walked from the kitchen into that—through the living room into the master bedroom into the closet crying." Appellant told Holbrook that Cowan had been embarrassed by this incident, and that she told appellant she was going to go on vacation and come back when the house was completed.

Benita Blare, who was then married to Holbrook and often helped him on his jobs, testified that she remembered Holbrook calling her from the Kingsland job site—she recalled the day as a Tuesday—to report the damage to the cabinets. Blare drove to the site and examined the damage. Blare testified that the cabinets "were busted on the top half of the cabinet and towards the floor on the side part of the cabinet." In addition, "there were these little speckles along the cabinet that looked like somebody had deliberately taken a paint brush with white paint and just dabbed them on his cabinets and in that white paint was black circles." Blare also noticed the trail of white paint that ran from the kitchen to the bedroom closet. Blare testified that the white paint covered the floor of the closet, as if "somebody had taken a whole gallon of white paint and just dumped it on the floor." Blare said that the paint trail did not appear to be an accidental spill, but "very deliberate." Blare testified that she touched some of the "black spots" on the cabinets and in the paint trail, and "it was definitely blood."

Bryan Thurman testified that he was hired by appellant to install the carpet and floor tile at the Kingsland house. Thurman said that appellant called him on a Saturday night and asked if he could start work the next day. When Thurman arrived at the site, the carpet padding had already been installed. This, according to Thurman, was "a real backwards way of doing things." Appellant told Thurman that he had put down the padding "to speed the process of the job up."

6

Thurman recalled that there was white paint on the kitchen floor, and that it looked as if someone had spilled the paint and rolled or mopped it rather than clean it. Thurman testified that he asked appellant if he wanted Thurman to scrape up the paint before laying the tile, and appellant told him not to. Appellant told Thurman that he was in a hurry to finish the house before his mother-in-law returned from her vacation.

Ranger Linderman testified that appellant never told him about the argument he claimed to have had with Cowan in the kitchen, or that Cowan had cut her finger while trying to strike appellant with a pipe. Linderman also testified that appellant never mentioned the trail of white paint, and that its existence was brought to his attention by appellant's children. Linderman, Travis County Sheriff's detective Chris Orton, and other officers subsequently conducted two searches of the Kingsland house. On May 4, 2001, the carpet and padding were pulled back to reveal the paint on the floor of the living room and bedroom. On May 21, 2001, some of the tile in the kitchen was removed to reveal the paint on the floor of that room. Photographs of the paint trail and the cabinets made during these searches were introduced in evidence.

The officers testified that luminol spray and other presumptive tests of the paint trail were positive for blood. Orton testified that the largest amount of paint was on the closet floor in the master bedroom. Orton said that when luminol was sprayed on this paint, "the way it lit up, it looked—what I saw was a body in the fetal position." Orton testified that in his opinion, someone still alive had lost a substantial amount of blood while lying in the closet. Orton's description of this luminol image was confirmed by Joseph Flores, an evidence technician who participated in the search.

7

The investigators took a large number of scrapings from the paint trail. They also removed portions of the wallboard in the kitchen containing suspected blood spots. Subsequent laboratory tests confirmed that the spots in the paint and on the wallboard were blood. A DNA expert testified that by using a sample of Karen Jack's saliva, he was able to determine with 99.9 percent certainty that the blood found in the house was Cowan's. A few of the blood spots contained a mixture of Cowan's DNA and DNA from another unidentified person. Appellant's DNA was not found in any of the samples taken from the house.

### Raymond Russell

Raymond Russell was the electrical subcontractor at the Kingsland house. Russell testified that he spoke to Cowan only once, soon after appellant hired him, and that she expressed the opinion that he was not working fast enough. Either that same day or a few days later, appellant told Russell, after a meeting with Cowan, that "he would be better off if she were dead." As Russell recalled the conversation, he replied, "[Y]eah, you can't live with them and you can't kill them. And [appellant] said yeah, you can; and I said, well, no there ain't nobody worth going to prison for; and he said, well, if they never find a body, you don't have to worry about it."

Russell also remembered seeing the white paint on the floor of the house. He noticed it on a day when he went to the job site to retrieve a roll of wire and a conduit bender, a tool which he described as a "three-quarter-inch pipe" about four feet long that is "threaded on one end with a handle end on the other." Cowan's car was parked in the driveway, preventing Russell from backing in his truck. Appellant, who was there, told Russell that he was driving Cowan's car because his truck "was in kind of bad shape." Russell testified that he could not find his conduit bender. Russell

8

said that he returned to the house a few days later to install some fixtures and plugs. The carpet padding was already down, which he said was "a little unusual because you get little snips of wire and junk under the padding, you know, it's hard to sweep up."

John Rucks, the manager of the trailer park where Cowan lived, testified that he recalled seeing a gray-haired, gray-bearded man driving Cowan's car. Russell acknowledged that he had a full, gray beard at the time he was working at the Kingsland house. Mike Holbrook (no relation to Bob Holbrook) testified that during the summer of 2001, he argued with Russell at a bar over money Russell owed him. Holbrook said that Russell became "verbally abusive" and said, "I'll bury you just like I buried that old woman." Another witness confirmed Holbrook's account. Russell testified that he did not know where Cowan lived and never drove her car except to move it once at the Kingsland construction site. Russell denied making the statement attributed to him by Mike Holbrook. At the time of appellant's trial, Russell was serving a prison sentence for the aggravated assault of his wife.[5]

### *Missing Person Report*

Heidi Fisher, the supervisor of the Texas Department of Public Safety's missing persons clearinghouse, testified that when a person is reported missing, her office conducts database searches, coordinates with other law enforcement agencies, and disseminates information to news organizations in an effort to generate leads. In February 2005, four years after Cowan disappeared, the clearinghouse received a telephone call from Joyce Nash, who lived in Dayton, in East Texas.

---

[5] The evidence reflects that Russell was convicted in 1995 and placed on probation. That probation was revoked in 2002.

Nash had seen a photograph of Cowan at the clearinghouse website and believed that she might have seen Cowan in a Dayton store. Fisher testified that she told Linderman about Nash's call, and that she followed up the call by arranging to have stories about Cowan, with photographs, run in Dayton-area newspapers. This effort produced no leads.

Nash, called by the defense, testified that she was 99 percent certain that the person she saw in 2005 was Cowan. She acknowledged during cross-examination, however, that she told Linderman in 2005 that she had hesitated to call and that the person she saw "might just be someone that looked like [Cowan]."

## LEGAL SUFFICIENCY

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard applies in both direct and circumstantial evidence cases. *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992). In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 234 S.W.3d at 778.

The corpus delicti of murder is established if the evidence shows the death of a human being caused by the criminal act of another. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993). Appellant does not dispute that Cowan is dead, but he contends that the

State failed to prove that she was intentionally killed. We disagree. Cowan's sudden and total disappearance, the discovery of Cowan's blood at the Kingsland house, and the obvious effort to hide that blood are more than sufficient to warrant the conclusion beyond a reasonable doubt that Cowan was the victim of an intentional homicide.

Appellant argues that if Cowan was murdered, the evidence gives stronger support to the theory that Russell was the murderer. Appellant asserts that Russell "had the opportunity, the violent temperament, and admitted his crime before two eyewitnesses," the latter assertion a reference to the statement, denied by Russell, about burying "the old woman." Appellant also suggests that Russell was the bearded man seen by Rucks driving Cowan's car. Appellant contends that the only reason he was accused of the murder, and not Russell, is that the investigating officers arbitrarily decided to build their case against appellant.

Appellant's argument fails because, in essence, he asks us to review the evidence in the light most favorable to Russell's guilt, rather than in the light most favorable to the jury's verdict. Although the evidence cited by appellant might cast a shadow of suspicion on Russell, it was not unreasonable for the jury to discount that evidence and to conclude instead that appellant murdered Cowan. Russell had no obvious motive to kill Cowan, while appellant was shown to have several: the money his wife stood to inherit, the souring of his business relationship with Cowan, and the anger he felt as a result of Cowan's many complaints about the quality of appellant's work. Moreover, appellant's attempt to shift the blame to Russell fails to account for the circumstances that most incriminate appellant: (1) appellant's story that he and Cowan had an argument in the kitchen during which she cut herself and then hid in the bedroom closet, which was an obvious attempt to explain the presence of Cowan's blood in the house, and (2) appellant's story that Cowan called him

11

to say that she was going on a vacation, a call she could not have made if she were dead. Appellant would have had no reason to tell these stories if Russell had murdered Cowan.

Viewing the circumstantial evidence in the light most favorable to the verdict, the jury could reasonably conclude that: (1) appellant brought Cowan to the Kingsland house and bludgeoned her in the kitchen, possibly with Russell's missing conduit bender, damaging the cabinets and splattering blood in the process; (2) appellant carried or dragged Cowan from the kitchen to the bedroom closet, where she bled and died; (3) appellant tried to hide Cowan's blood on the cabinets and floor with paint and, when that did not work, made up the story about Cowan cutting herself during an argument and hiding in the closet in embarrassment; and (4) to explain Cowan's sudden disappearance, appellant also made up the story about the telephone call announcing her sudden decision to take a vacation. The evidence is legally sufficient to sustain the jury's verdict convicting appellant of Cowan's murder. Issue one is overruled.

**FACTUAL SUFFICIENCY**

In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if the evidence

12

supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Appellant argues that, viewed in a neutral light, the motive evidence was insubstantial. To counter the suggestion that he was angered by Cowan's constant criticism, appellant points to the testimony of more than one witness to the effect that he calmly shrugged off Cowan's complaints and went about his business. But the jury might reasonably conclude that even the calmest of persons has a breaking point, and that Cowan had pushed appellant past his. Appellant also dismisses the money motive, saying that his wife stood to inherit from Cowan in any case. But Cowan was only sixty years old, and perhaps appellant did not want to wait.

Appellant urges that the record as a whole does not support the conclusion that Cowan was killed at the Kingsland house, or even that her death was a homicide. Citing testimony from family members that Cowan was unpredictable and sometimes drank to excess, and pointing to Nash's testimony that she thought she saw Cowan in East Texas in 2005, appellant suggests that it is not unreasonable to believe that Cowan suddenly decided to leave and, for some reason, never came back. There was, however, no evidence suggesting that Cowan might deliberately abandon family and friends without a word; to the contrary, there was considerable evidence that she would not do such a thing.[6] There was no evidence that Cowan suffered from dementia of any other condition that might have caused her to simply wander off and never return, and in any event it is

---

[6] Although there is evidence that Cowan's relations with her daughters were sometimes strained, the evidence shows that she had close and confiding relationships with her granddaughter Natasha Stieler, her brother-in-law Nelson Cowan, and her long-time friend Merida Zeek. Each of these persons testified that he or she spoke to Cowan regularly and would have known if she had travel plans. They also agreed that Cowan would never have abandoned her dogs.

13

unlikely that she could have done so without leaving some evidence of her activities.  And Nash's certainty in her identification of Cowan appears to have been stronger in 2007 than it was in 2005. It was not unreasonable for the jury to give little weight to this evidence.

Appellant makes much of inconsistencies in the testimony regarding the relevant dates.  Stieler testified that she had dinner with Cowan on Sunday night.  Appellant points out that Bob Holbrook testified that he discovered the blood, paint trail, and damage to the cabinets on that Sunday, which would suggest that the injuries that Cowan suffered in the kitchen of the Kingsland house were inflicted on Saturday and were not fatal.  Holbrook's wife testified, however, that Holbrook discovered the signs of the kitchen fracas on a Tuesday, which is consistent with the theory that Cowan was killed at the house on the Monday following her dinner with her granddaughter. Considering that the witnesses were attempting to recall events six years after they happened, the inconsistencies cited by appellant are not surprising and do not cast serious doubt on the jury's verdict.

Appellant also urges that the small amount of blood found in the Kingsland house was inconsistent with the State's theory that Cowan was beaten to death at the house, and is more consistent with his claim that Cowan cut herself during an argument.  In fact, it is impossible to know exactly how much blood was on the floor of the house because the paint obscured it.  Even so, the amount of bleeding shown by the evidence seems to be far more than would be expected from a cut finger.  Appellant does not suggest why, if his story about the argument and the cut finger were true, he attempted to hide Cowan's blood, nor does he suggest any reason for someone else to do so.

14

Finally, appellant again points to Russell as the guilty party. We have already discussed this theory, and we will not repeat our discussion here. It is sufficient to say that the evidence preponderates against it.

Considering the record as a whole in a neutral light, the evidence supporting the jury's verdict is not so weak as to make the finding of guilt clearly wrong and manifestly unjust. The jury's verdict is not against the great weight and preponderance of the available evidence. Issue two is overruled.

## VENUE

Over appellant's objection, the trial court instructed the jury at the guilt stage that "[i]f a person receives an injury in one county and dies in another by reason of such injury, the offender may be prosecuted in the county where the injury was received or where the death occurred." *See* Tex. Code Crim. Proc. Ann. art. 13.07 (West 2005). Appellant argues that because this instruction was given, the State was bound to prove that venue was proper under the statute. *See Murphy v. State*, 112 S.W.3d 592, 605 (Tex. Crim. App. 2003) ("Venue will stand if it is sufficient under any one of the venue provisions the jury was instructed upon"). Appellant argues that the State failed to prove that venue was correct under article 13.07 because there is no evidence that Cowan was injured in some other county and then died in Llano County.

Assuming for the sake of this opinion that the State was required to prove venue under article 13.07, it met that burden. Appellant's argument confuses the predicate for invoking article 13.07—injury in one county, death in another—with the venue fact that must be proved. The preponderance of the evidence shows that Cowan received her fatal injuries at the Kingsland house,

15

in Llano County.  *See* Tex. Code Crim. Proc. Ann. art. 13.17 (West 2005) (burden of proof). Therefore, under article 13.07, venue was proper in Llano County whether Cowan died there or in some other county.  Issue three is overruled.

The judgment of conviction is affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   May 6, 2009

Do Not Publish